MARTIN J. BRILL (State Bar No. 53220)
DAVID B. GOLUBCHIK (State Bar No. 185520)
JEFFREY S. KWONG (State Bar No. 288239)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
Email: mjb@lnbyb.com; dbg@lnbyb.com; jsk@lnbyb.com

Proposed Attorneys for Chapter 11 Debtor and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**LOS ANGELES DIVISION**

| | |
|---|---|
| In re:<br><br>8800 LLC,<br><br><br>        Debtor and Debtor in Possession. | Case No. 2:18-bk-17263-RK<br><br>Chapter 11<br><br>**OMNIBUS DECLARATION OF ALAN NATHAN IN SUPPORT OF EMERGENCY FIRST DAY MOTIONS**<br><br><br>Date:  July 5, 2018<br>Time:  10:00 a.m.<br>Place:  Courtroom 1675<br>            255 East Temple Street<br>            Los Angeles, California 90012 |

I, Alan Nathan, hereby declare as follows:

1.      I am over 18 years of age.  I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.      I am the Managing Member of 8800 LLC (the "Debtor").  Based on my position with the Debtor, I have access to the Debtor's books and records and am familiar with them. The Debtor's books and records form the basis for any statements in this declaration, and constitute writings taken, made, or maintained in the regular or ordinary course of the Debtor's business at or near the time of act, condition or event to which they relate by persons employed by the Debtor who had a business duty to the Debtor to accurately and completely take, make, and maintain such records and documents. Based on my position with the Debtor, I am also familiar with the history, organization, operations, and financial condition of the Debtor.

3.      I make this declaration in support of the following emergency "first day" motions (collectively, the "First Day Motions") filed concurrently herewith by the Debtor:

- DEBTOR'S EMERGENCY MOTION FOR ENTRY OF AN ORDER: (1) AUTHORIZING THE USE OF CASH COLLATERAL ON INTERIM BASIS; AND (2) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(b) (the "Cash Collateral Motion").

- DEBTOR'S EMERGENCY MOTION FOR AUTHORITY TO (1) PAY PRE-PETITION PRIORITY WAGES; AND (2) HONOR CERTAIN EMPLOYEE HEALTH, AND ACCRUED VACATION AND LEAVE BENEFITS (the "Wage Motion").

- DEBTOR'S EMERGENCY MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTOR TO PROVIDE ADEQUATE ASSURANCE OF FUTURE PAYMENT TO UTILITY COMPANIES PURSUANT TO 11 U.S.C. § 366 (the "Utilities Motion").

4.      I believe that it is necessary for the Court to hold hearings on the First Day Motions on an emergency basis, in order to avoid immediate and irreparable harm to the estate.

5.      On June 22, 2018 ("Petition Date"), the Debtor filed a voluntary petition under the Bankruptcy Code.   The Debtor is operating its business, managing its financial affairs and

operating its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

6.    The Debtor is the owner and operator of an entertainment facility – which includes a fine dining restaurant specializing in Italian-American fare, known as "Estrella" (the "Restaurant");  a semi-secret lounge for cocktail receptions, social events, and live entertainment, known as the "Ma Lounge" (the "Lounge"); and a state-of-the-art theatre that was used for private screenings and events known as the "Ma Theatre" (the "Theatre," and together with the Restaurant and Lounge, the "Entertainment Facility").    The overarching concept for the Entertainment Facility was inspired by the "Hollywood Hills bungalow" culture of the 1960s and 1970s, and the facility offers patrons a variety of beautiful, comfortable, and flexible indoor and outdoor spaces for their needs.

7.    The Debtor has approximately 34 employees, a loyal customer base, and has invested substantial amounts of money into its business and improving the existing premises where it operates the Entertainment Facility.

8.    The Debtor's Entertainment Facility is located at 8800 Sunset Boulevard, West Hollywood, California (the "Premises"), and the Debtor occupies the Premises pursuant to the "*Restaurant Lease*" dated December 13, 2013 (as, amended, the "Lease") and "*License Agreement*" dated December 13, 2013 (and collectively with the Restaurant Lease, the "Facility Lease"), entered into between the Debtor[1] and TMC Realty L.L.C. (the "Landlord").    The Lease has an initial term of ten years ending in approximately November 2025, with two five year options to extend/renew.    The Lease also contains a provision for the Landlord to "recapture" and terminate the Lease, but only upon the satisfaction and occurrence of several conditions required therein (the "Recapture Provision")[2].

---

[1]    The original tenant under the Lease was 8800 Sunset, LLC.    Due to certain litigation related to the Landlord, where 8800 Sunset, LLC was named as a defendant, after its conclusion, the Landlord suggested that the name of the entity be changed, which resulted in a name change to 8800, LLC.    I am in possession of written communication with, and consent of, the Landlord to the foregoing.    Since that time, the Debtor (8800, LLC) has operated under such name, including making all rent payments in such name, which the Landlord accepted.

[2]    The "Recapture Provision" required, as a prerequisite the submission of a complete package of documents to the Landlord.    A complete package was not submitted, as confirmed by Landlord's representative asserting that the submission was incomplete.    As a result, I believe that the "Recapture Provision" was never triggered.

9.    The Landlord and its affiliates (the "Landlord Entities") own the Premises and several buildings in the immediate surrounding area (the "Buildings"); they also own and operate several businesses, which comprise of all or a majority of the other tenants in the Buildings, including large companies such as Match.com and Tinder.

10.    Before execution of the Lease – despite the Debtor initially only wanting to be open for dinner service due to the large overhead costs associated with extended breakfast and lunch hours – the Landlord insisted that the Lease require that the Debtor be open for breakfast and lunch service starting at 7:00 a.m. on the weekdays, as a service and amenity to the approximately 450 employees of the Landlord Entices in the surrounding area (the "Landlord Employees").  The Debtor primarily relied on the Landlord's assurance that weekday breakfast and lunch service would be profitable for the Debtor due to the large number of Landlord Employees in the area, and agreed to the Landlord adding such provision into the Lease.

11.    Shortly after execution of the Lease, the Debtor began the process of construction to improve the Premises, to make it suitable for the Debtor's use.  As a result, the Debtor spent almost 2 years and no less than $2.5 million to transform the once-dilapidated parcel into a beautiful entertainment complex that is professionally adorned with, among other things, macrame lampshades and sea shells, hand-painted Mexican tiles, leather bar stools handmade in Spain, and A-frame ceilings.

12.    In November 2015, the Debtor opened the Entertainment Facility for business. The Debtor's business was an almost-immediate success, and the Entertainment Facility garnished many customers and a loyal following.  In fact, the Debtor's revenue for its first year totaled approximately $3.5 million.

13.    However, more recently, the gratuitous tides have changed and the Debtor experienced some serious financial difficulties.  Primarily, this was because – despite the Lease granting the Debtor the exclusive right for restaurant operations – the Landlord Entities (including the Landlord and Tinder) started implementing measures that detrimentally impacted the Debtor's business, including: (1) providing free breakfast, lunch, and dinner catering to the Landlord

Employees on the weekdays (which took away a large portion of the Debtor's previous revenue from its weekday breakfast and lunch service); and (2) providing free catering to the tenants of the Buildings every Friday (which, eventually, caused the Debtor to cancel its lunch service to save on operating costs). Put another way, the once-successful Debtor could not compete with the free meals that the Landlord Entities began providing to the Landlord Employees and tenants in the Buildings, an important source of business and customer base that the Debtor had relied on to counter the substantial operating costs associated with keeping its business open for weekday breakfast and lunch service at the Landlord's previous insistence. Moreover, despite being required under the Lease to be open at 7:00 a.m. for breakfast service, the Landlord never disclosed to the Debtor during Lease negotiations that many of the tenants in the Buildings, including the Landlord Employees, did not arrive at work until or after 10:00 a.m., thus causing the Debtor to open its business several hours before there was any meaningful business.

14.    As a result of declining profits, revenues, and overall financial performance, in June 2017, I determined that the Debtor required a cash infusion to continue operations and stay in business.

15.    In November 2017, I engaged in discussions with a potential partner (the "Potential Partner") on a proposal for the Potential Partner to provide the Debtor with the necessary capital to maintain and improve operations. While discussions were pending, I notified the Landlord about the Potential Partner, and the Landlord indicated that it had no objection to the contemplated transaction between the Debtor and the Potential Partner.

16.    However, while discussions between the Debtor and the Potential Partner were pending, another party (the "Potential Purchaser") offered to purchase the Debtor's business and take assignment of the Facility Lease for, among other things, approximately $1,000,000 (the "Transaction"). The Potential Purchaser was well-capitalized, experienced in restaurant ownership and operations, and had a Michelin star chef. A sale of the Debtor's business, as contemplated by the Transaction, would have allowed the Debtor to pay its creditors in full, allow for a distribution to equity, and maintain the livelihood and jobs of its business and employees

respectively.   As a result, the Debtor entered into a tentative purchase agreement with the Potential Purchaser, and submitted the request for assignment of the Lease to the Landlord. Throughout this period, the Landlord was apprised of the developments and was supportive of the Debtor's efforts.

17.    Unexpectedly, on April 2018 – before all of the required documents were submitted to the Landlord for it to consider the assignment request pursuant to the Lease, and before the conditions precedent to the Recapture Provision under the Lease were satisfied – the Landlord notified me that it would improperly and prematurely invoke the Recapture Provision and terminate the Lease.

18.    The Landlord's decision to improperly invoke the Recapture Provision caused the Potential Purchaser to terminate its purchase agreement with the Debtor with respect to the Transaction.

19.    Believing, among other things, that the Landlord had breached the Lease, the Debtor filed an action against the Landlord, styled *8800 LLC, a California Limited Liability Company v. TMC Realty, L.L.C.*, Case No. BC706293, that is pending in the Superior Court of California, County of Los Angeles (the "State Court").

20.    After the filing of the above referenced case by 8800 LLC, on May 11, 2018, despite the fact that the Recapture Provision has not yet been triggered, the Landlord sent a three-day notice to quit to 8800 Sunset, LLC (which I believe was defective) and, on May 16, 2018, the Landlord filed an unlawful detainer action, styled *TMC Realty, LLC v. 8800 Sunset LLC,* Case No. SC129282 (the "UD Action").

21.    The Debtor, through its counsel, informed the Landlord that it had named and served the wrong party in the UD Action.  The Debtor informed the Landlord that the proper party, and the party in possession of the premises under the Lease, was 8800, LLC.

22.    On or about May 22, 2018, the Landlord filed a First Amended Complaint in the UD Action naming 8800, LLC as a defendant, although a notice to quit was not provided to 8800, LLC, as, I am advised, was required under applicable laws.

23.     On or about May 29, 2018, the Debtor filed and served a demurrer to the First Amended Complaint, stating, among other things, that the Landlord never served the Debtor with a three-day notice, and therefore did not have a proper cause of action against Debtor.

24.     After the Debtor stipulated to the Landlord's request to hold the hearing on the Demurrer on shortened notice, the Demurrer came before the Court on June 19, 2018, whereby the Debtor's Demurrer was sustained and the Landlord was provided with 10 days to amend its First Amended Complaint.

25.     Based on all of the foregoing, in order to stay the eviction process, preserve the Debtor's interest in the Lease, protect the Debtor's business and employees, and allow the Debtor an opportunity to reorganize its debts and affairs in bankruptcy, on June 22, 2018, the Debtor filed its Chapter 11 bankruptcy petition.

**Cash Collateral Motion**

26.     The Cash Collateral Motion seeks an order of the Court authorizing the Debtor to use cash collateral to pay all of its projected expenses set forth in the budget (the "Budget") attached as **Exhibit "1"** hereto.  The Debtor further seeks Court authority to deviate from the projected expenses contained in the Budget by up to 10% by line item and 10% in the aggregate without the need for any further Court order, because numbers due vary on a regular basis and expenses are not fixed.

27.      The Debtor's primary assets are as follows:

- Cash.   As of the Petition Date, the Debtor had approximately $21,000 in cash.

- Accounts Receivable.  As of the Petition Date, the Debtor had accounts receivable in the amount of approximately $16,000.

- Inventory.  As of the Petition Date, the Debtor had inventory which includes, but is not limited to, perishable food, dry goods, and liquor, with an estimated value of approximately $20,000.

- Fixed Assets.  As of the Petition Date, the Debtor had fixed assets which include, but are not limited to, furniture, fixtures, equipment, licenses and permits, music

and stereo equipment, and other equipment with an estimated value on a cost basis of approximately $1,300,000.

- Other Assets. As of the Petition Date, the Debtor had other assets including, among other things, security deposits, liquor license, utility deposits, and other deposits at an estimated value of $200,000.

28.    The Debtor has three secured creditors, consisting of On Deck Capital ("On Deck"), Arcarius LLC ("Arcarius"), and Sysco Los Angeles, Inc. ("Sysco," and collectively, the "Secured Creditors").

29.    Sysco is one of the Debtor's vendors and creditors. On May 29, 2015, Sysco filed a UCC-1 financing statement with the California Secretary of State ("Financing Statement") to secure the Debtor's "present and future indebtedness and liabilities to Sysco" on all or substantially all of the Debtor's assets. As of the Petition Date, I believe that the Debtor owes Sysco approximately $4,300, and that it is current with all payments to Sysco.

30.    On Deck has a claim of approximately $17,000 secured by a second priority lien on all or substantially all of the Debtor's assets. The $17,000 amount represents the approximate outstanding balance owed by the Debtor to On Deck on account of a $125,000 business loan dated November 6, 2017 from On Deck to the Debtor.

31.    Arcarius has a claim of approximately $178,000 secured by a third priority lien on all or substantially all of the Debtor's assets. The $178,000 amount represents the approximate outstanding balance owed by the Debtor to Arcarius on account of a $140,000 loan dated June 18, 2018 from Arcarius to the Debtor. As of the Petition Date, I believe that the Debtor is current with all payments to Arcarius.

32.    I have been advised and understand that the Debtor's cash may be the cash collateral of the Secured Creditors, although I believe that the Debtor's revenue is generated in large part by the service of its employees and personnel in connection with services rendered by the Debtor and not simply the collateral.

33.    The Debtor has no ability to continue to operate and preserve its business as a going concern unless it can use its current cash and future revenue generated by its business to pay its operating expenses, including, but not limited to, payroll, utilities, rent, and to replenish inventory for the Restaurant.  In order for the Debtor to be able to operate its business while in Chapter 11 and to avoid immediate and irreparable harm to its business, I believe that the Debtor must be able to use (a) all of its cash existing on the Petition Date plus (b) the Debtor's post-petition revenue generated from the operation of its business to pay the Debtor's post-petition operating expenses in accordance with the Budget.

34.    The Budget contains the expenses that I believe must be paid in order for the Debtor to operate and preserve the value of its business and to enable the Debtor to avoid immediate and irreparable harm to the Debtor's bankruptcy estate.  Given the Debtor's current operating and projected operating performance (as evidenced by the projections in the Budget) and the fact that the going concern value of the Debtor's business would be lost if the Debtor was forced to shut down its business, I submit that the Secured Creditors are adequately protected and substantially benefited by the Debtor's continued operation of its business and use of cash collateral.

35.    Based on the current estimated aggregate value of the collateral (including the Debtor's cash, accounts receivable, inventory, fixed assets, and other assets), which I believe is worth approximately $1,600,000, I submit that the Secured Creditors' liens (securing the Secured Creditors' claims in the aggregate amount of approximately $200,000) are adequately protected by a substantial and meaningful equity cushion.  Further, I believe that the collateral will not be depreciating in any meaningful amount in the short run, and thus there is no need for the Debtor to be required to make adequate protection payments.

36.    If the Debtor was not able to operate and had to liquidate, I believe that the value of its assets would be minimal since the Debtor is in the food business.  Additionally, the Debtor's FF&E would be worth a fraction of their value as used equipment if liquidated.  In the event of a liquidation, I believe that there would not be sufficient proceeds to satisfy the claims of creditors,

while ongoing operations would allow the Debtor to pay its debts (both post-petition and pre-petition), while continue to provide jobs for dozens of its employees.

37.    In addition, as further adequate protection of the Debtor's use of cash collateral, I submit that the Debtor's continued operation will protect the value of the Secured Creditors' collateral, and that the Secured Creditors would receive replacement liens against the Debtor's post-petition assets, with such replacement liens to have the same validity, priority, and extent as the prepetition liens held by the Secured Creditors against the Debtor's cash.

38.    The only current source of revenue available to the Debtor to use to maintain and operate its business is the revenue being generated from its business and the Entertainment Facility.  Accordingly, the Debtor requests that the Court grant the Cash Collateral Motion, by entering an order in substantially the same form as the proposed form of order attached as **Exhibit "2"** hereto, authorizing the Debtor to use cash collateral.

### **Wage Motion**

39.    Through the Cash Collateral Motion, the Debtor seeks authority to pay all pre-petition Wages of the Employees, provided that no Employee shall receive in value over $12,850 on account of pre-petition claims for Wages; and honor certain employee health, dental, vision, and accrued vacation and sick leave benefits, which I believe are typically offered by other employers within the industry.

40.    The Debtor has approximately 34 non-insider employees (the "Employees").  The Debtor pays the Employees on the 5th and 20th of each month.  The Debtor's next pay period for the Employees covers June 16, 2018 to June 29, 2018 (the "Pay Period").  Thus, the Pay Period includes both prepetition and postpetition periods.  The Pay Period includes a prepetition period covering June 16, 2018 through and including June 22, 2018 (the "Prepetition Period"), and a postpetition period covering June 23, 2018 through and including June 29, 2018 (the "Postpetition Period").  Attached as **Exhibit "4"** hereto is a chart showing all of the wages, salaries, commissions, and/or bonuses (the "Wages") that accrued during the Pay Period for the Employees that remain unpaid (the "Wage Exhibit).  As can be seen from the Wage Exhibit, the total amount

of Wages (excluding tips) for the Prepetition Period is approximately $10,290.27. I estimate that the aggregate amount of tips owed by the Debtor to the Employees for the Prepetition Period is $4,483.33.

41.     All Employees that the Debtor is seeking to pay Wages for the Prepetition Period are still employed by the Debtor. As can be seen from the Wage Exhibit, none of the Employee's wages for the Prepetition Period exceed the $12,850 limit set forth in Section 507(a)(4). Based on the Budget, payment of the Wages (including the Wages for the Prepetition Period) will not render the Debtor's estate administratively insolvent.

42.     The Debtor also requests that it be authorized, but not required to pay all payroll taxes related to the Wages. Such payroll taxes total approximately $1,059.90 for the Prepetition Period.

43.     The source of the funds to be used to pay and/or honor the pre-petition Wages will be the Debtor's revenues from operations.

44.     In order to attract and retain the Debtor's employees, the Debtor also maintains what I believe to be reasonable employee benefits (the "Employee Benefits"), consisting of: (a) health, dental, vision insurance benefits (the "Health Benefits"); and (b) accrued vacation and sick leave benefits (the "Leave Benefits," and together with the Health Benefits, the "Employee Benefits") to its qualified[3] Employees. The Debtor would like to continue honoring its policies with regards to providing Health Benefits to its Employees. Further, in the ordinary course of the Debtor's business, the Employees are authorized to take their accrued vacation or sick leave time in connection with their continued service. Maintaining good relationships with, and the morale of, the employees requires continuing to honor the policies providing for the Employee Benefits currently in effect for the Employees. Accordingly, the Debtor is seeking authority to honor these policies postpetition for the benefit of the Employees.

45.     The Debtor's employees are not high-paid individuals, but rather live paycheck to paycheck where every dollar during every pay period is critical to their survival and that of their

---

[3] The Debtor provides the Health Benefits to its full-time employees.

families.    Needless to say, the Debtor cannot maintain its business operations without its Employees.    As an operating business, I believe that it is crucial for the Debtor to maintain a sufficient number of Employees to operate its operations.    If the Debtor does not continue to pay the Employees their ordinary and earned Wages and to honor its Employee Benefits, the morale of the Employees will drop significantly, and the Employees will likely quit.    Without the Employees, the Debtor's operations and the value of its business will be severely impaired, if not eviscerated altogether.    The Debtor must retain the Employees to remain in business and preserve the value of its assets.    Based on the foregoing, I respectfully submit that the relief requested in the Motion is necessary to avoid immediate and irreparable harm.

**Utility Motion**

46.    Through the Utility Motion, the Debtor requests that the Court enter an order authorizing it to provide adequate assurance of future payment to certain Utility Companies.

47.    In connection with the operation of the Debtor's business, the Debtor receives gas, internet, phone, sewer and/or similar utility services from a number of utility companies (each a "Utility Company," and collectively, the "Utility Companies").    Given the importance of the services provided by the Utility Companies to the continued operation of the Debtor's business, it is crucial that the means of providing adequate assurance to the Utility Companies that provide utility services to the Debtor be determined promptly so that there is no interruption in the services provided.

48.    Attached as **Exhibit "3"** hereto is a list which sets forth, among other things, the name and address of each Utility Company that is currently providing utility services to the Debtor, the type of utility service provided by each Utility Company, the account numbers associated with each Utility Company, and the amount of the cash deposit proposed to be paid to each Utility Company (collectively, the "Cash Deposits," and individually, a "Cash Deposit").

49.    The total aggregate amount of the Cash Deposits proposed to be paid to the Utility Companies by the Debtor is $1,498.95.  The Debtor is proposing to provide each Utility Company with a Cash Deposit in an amount equal to the average monthly payment based on payments

billed for the respective utility account(s) during the three-month period preceding the Petition Date.

50.    In addition to the Cash Deposits, the Utility Companies will be kept current on all post-petition amounts payable to such Utility Companies.

51.    The source of the funds to be used to pay the proposed Cash Deposits to the Utility Companies will be the Debtor's revenue.

52.    I submit that paying the proposed Utility Deposits is necessary and appropriate in order to allow the Debtor's business to continue operating and maintain the value of the Debtor's business.

I declare and verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on July 2, 201  , in Los Angeles, California.


_____
ALAN NATHAN

# EXHIBIT "1"

**Estrella**

| | Forecast Working July 2 | | Forecast Working July 9 | | Forecast Working July 16 | | Forecast Working July 23 | | Forecast Working July 30 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Number of covers | 993 | 166 | 1,076 | 179 | 1,124 | 187 | 1,189 | 198 | 1,217 | 203 |
| Average Spent PP - Total | $ 45.00 | | $ 45.00 | | $ 45.00 | | $ 45.00 | | $ 45.00 | |
| Average Spent PP - Food | $ 28.00 | | $ 28.00 | | $ 28.00 | | $ 28.00 | | $ 28.00 | |
| Average Spent PP - Beverage | $ 17.00 | | $ 17.00 | | $ 17.00 | | $ 17.00 | | $ 17.00 | |
| Number of days operating | 6 | | 6 | | 6 | | 6 | | 6 | |

| | July 2 | % | July 9 | % | July 16 | % | July 23 | % | July 30 | % |
|---|---|---|---|---|---|---|---|---|---|---|
| FOOD REVENUE - TOTAL | 27,804 | 62.22% | 30,128 | 62.22% | 31,472 | 62.22% | 33,292 | 62.22% | 34,076 | 62.22% |
| BEVERAGE REVENUE - TOTAL | 16,881 | 37.78% | 18,292 | 37.78% | 19,108 | 37.78% | 20,213 | 37.78% | 20,689 | 37.78% |
| OTHER REVENUE | - | 0.00% | - | 0.00% | - | 0.00% | - | 0.00% | - | 0.00% |
| MISC REVENUE | - | 0.00% | - | 0.00% | - | 0.00% | - | 0.00% | - | 0.00% |
| GROSS SALES | 44,685 | | 48,420 | | 50,580 | | 53,505 | | 54,765 | |
| COMPLIMENTARY | 1,787 | 4.00% | 1,937 | 4.00% | 2,023 | 4.00% | 2,140 | 4.00% | 2,191 | 4.00% |
| INCOME FROM OPERATION | 42,898 | 96.00% | 46,483 | 96.00% | 48,557 | 96.00% | 51,365 | 96.00% | 52,574 | 96.00% |
| SALES/MARKETING COSTS | 894 | 2.00% | 968 | 2.00% | 253 | 0.50% | 268 | 0.50% | 274 | 0.50% |
| FOOD COST - TOTAL | 4,171 | 15.00% | 7,833 | 26.00% | 8,183 | 26.00% | 8,656 | 26.00% | 9,541 | 28.00% |
| BEVERAGE COST - TOTAL | 1,688 | 10.00% | 1,829 | 10.00% | 1,911 | 10.00% | 2,021 | 10.00% | 4,014 | 19.40% |
| OTHER COSTS | - | 0.00% | - | 0.00% | - | 0.00% | - | 0.00% | - | 0.00% |
| MISCELLANEOUS COSTS | - | 0.00% | - | 0.00% | - | 0.00% | - | 0.00% | - | 0.00% |
| COST OF GOOD SOLD | 6,752 | 15.13% | 10,631 | 21.96% | 10,346 | 20.46% | 10,945 | 20.46% | 13,829 | 25.25% |
| GROSS MARGIN | 36,145 | 80.89% | 35,852 | 74.04% | 38,210 | 75.54% | 40,420 | 75.54% | 38,746 | 70.75% |
| PAYROLL | - | | | | | | | | | |
| FRONT OF HOUSE | 4,915 | 11.00% | 5,326 | 11.00% | 5,311 | 10.50% | 5,565 | 10.40% | 5,641 | 10.30% |
| BACK OF HOUSE | 5,809 | 13.00% | 6,198 | 12.80% | 6,424 | 12.70% | 6,688 | 12.50% | 6,736 | 12.30% |
| RESTAURANT MANAGER\|CHEF | 1,923 | 4.30% | 1,923 | 3.97% | 1,923 | 3.80% | 1,923 | 3.59% | 3,558 | 6.50% |
| ALLOCATED | - | 0.00% | | | | | | | | |
| PAYROLL TAXES | 1,787 | 4.00% | 1,937 | 4.00% | 2,023 | 4.00% | 2,140 | 4.00% | 2,191 | 4.00% |
| BENEFITS | 1,653 | 3.70% | 1,792 | 3.70% | 1,871 | 3.70% | 1,980 | 3.70% | 2,026 | 3.70% |
| PAYROLL, PR TAXES & BENEFITS | 16,088 | 36.00% | 17,175 | 35.47% | 17,552 | 34.70% | 18,296 | 34.19% | 20,151 | 36.80% |
| DIRECT EXPENSES | 1,341 | 3.00% | 2,542 | 5.25% | 2,655 | 5.25% | 2,809 | 5.25% | 2,875 | 5.25% |
| ADMINISTRATION & GENERAL | 2,234 | 5.00% | 3,050 | 6.30% | 3,085 | 6.10% | 3,264 | 6.10% | 3,341 | 6.10% |
| ADVERTISING & PROMOTIONS | 1,341 | 3.00% | 1,453 | 3.00% | 1,517 | 3.00% | 1,605 | 3.00% | 2,191 | 4.00% |
| REPAIRS & MAINTENANCE | 447 | 1.00% | 484 | 1.00% | 1,012 | 2.00% | 1,070 | 2.00% | 1,095 | 2.00% |
| UTILITIES | 894 | 2.00% | - | 0.00% | - | 0.00% | - | 0.00% | 2,191 | 4.00% |
| RENT | 25,000 | 55.95% | - | 0.00% | - | 0.00% | - | 0.00% | 25,000 | 45.65% |
| OPERATING EXPENSES | 31,256 | 69.95% | 7,529 | 15.55% | 8,270 | 16.35% | 8,748 | 16.35% | 36,692 | 67.00% |
| EXPENSES | 47,344 | 105.95% | 24,705 | 51.02% | 25,822 | 51.05% | 27,044 | 50.54% | 56,844 | 103.80% |
| NET OPERATING INCOME | (11,199) | -25.06% | 11,148 | 23.02% | 12,388 | 24.49% | 13,376 | 25.01% | (18,098) | -33.05% |
| CONSULTING FEE EXPENSE | 2,234 | 5.00% | 2,421 | 5.00% | 2,529 | 5.00% | 2,675 | 5.00% | 2,738 | 5.00% |
| EBITDA | (13,433) | -30.06% | 8,727 | 18.02% | 9,859 | 19.49% | 10,701 | 20.00% | (20,836) | -38.05% |
| CAPEX Reserve | 447 | 1.00% | 484 | 1.00% | 506 | 1.00% | 535 | 1.00% | 548 | 1.00% |
| NET INCOME | (13,880) | -31.06% | 8,242 | 17.02% | 9,353 | 18.49% | 10,166 | 19.00% | (21,384) | -39.05% |

**ASSET ANALYSIS**

| | July 2 | July 9 | July 16 | July 23 | July 30 |
|---|---|---|---|---|---|
| STARTING CASH | 21000 | 7120 | 15362 | 24716 | 34882 |
| CHANGE IN CASH | - 13,880 | 8,242 | 9,353 | 10,166 | - 21,384 |
| ENDING CASH | 7120 | 15362 | 24716 | 34882 | 13498 |
| STARTING INVENTORY | 20582 | 19,648 | 18,345 | 16,024 | 17,275 |
| CHANGE IN INVENTORY | 934 | 1,303 | 2,321 | (1,251) | (423) |
| ENDING INVENTORY | 19,648 | 18,345 | 16,024 | 17,275 | 17,698 |
| ACCOUNTS RECEIVABLE | 16000 | 16000 | 16000 | 16000 | 16000 |
| FIXED ASSETS | 1300000 | 1300000 | 1300000 | 1300000 | 1300000 |
| OTHER ASSETS | 200000 | 200000 | 200000 | 200000 | 200000 |
| TOTAL ASSET BASED AT END OF THE PERIOD | 1,542,768 | 1,549,707 | 1,556,740 | 1,568,157 | 1,547,196 |

**Estrella**

| | Forecast Working August 6 | | Forecast Working August 13 | | Forecast Working August 20 | | Forecast Working August 27 | | Forecast Working September 3 | | Forecast Working September 10 | | Forecast Working September 17 | | Forecast Working September 24 | | Forecast Working Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of covers | 1,229 | 205 | 1,261 | 210 | 1,288 | 215 | 1,303 | 217 | 1,204 | 201 | 1,424 | 237 | 1,459 | 243 | 1,468 | 245 | |
| Average Spent PP - Total | $45.00 | | $45.00 | | $45.00 | | $45.00 | | $45.00 | | $45.00 | | $45.00 | | $45.00 | | |
| Average Spent PP - Food | $28.00 | | $28.00 | | $28.00 | | $28.00 | | $28.00 | | $28.00 | | $28.00 | | $28.00 | | |
| Average Spent PP - Beverage | $17.00 | | $17.00 | | $17.00 | | $17.00 | | $17.00 | | $17.00 | | $17.00 | | $17.00 | | |
| Number of days operating | 6 | | 6 | | 6 | | 6 | | 6 | | 6 | | 6 | | 6 | | 357 |
| | | | | | | | | | | | | | | | | | |
| FOOD REVENUE - TOTAL | 34,412 | 62.22% | 35,308 | 62.22% | 36,064 | 62.22% | 36,484 | 62.22% | 33,712 | 62.22% | 39,872 | 62.22% | 40,852 | 62.22% | 41,104 | 62.22% | 116,032 |
| BEVERAGE REVENUE - TOTAL | 20,893 | 37.78% | 21,437 | 37.78% | 21,896 | 37.78% | 22,151 | 37.78% | 20,468 | 37.78% | 24,208 | 37.78% | 24,803 | 37.78% | 24,956 | 37.78% | 70,448 |
| OTHER REVENUE | - | 0.00% | - | 0.00% | - | 0.00% | - | 0.00% | - | 0.00% | - | 0.00% | - | 0.00% | - | 0.00% | - |
| MISC REVENUE | - | 0.00% | - | 0.00% | - | 0.00% | - | 0.00% | - | 0.00% | - | 0.00% | - | 0.00% | - | 0.00% | - |
| GROSS SALES | 55,305 | | 56,745 | | 57,960 | | 58,635 | | 54,180 | | 64,080 | | 65,655 | | 66,060 | | 186,480 | 100.00% |
| | | | | | | | | | | | | | | | | | |
| COMPLIMENTARY | 2,212 | 4.00% | 2,270 | 4.00% | 2,318 | 4.00% | 2,345 | 4.00% | 2,167 | 4.00% | 2,563 | 4.00% | 2,626 | 4.00% | 2,312 | 3.50% | 7,129 | 3.82% |
| | | | | | | | | | | | | | | | | | |
| INCOME FROM OPERATION | 53,093 | 96.00% | 54,475 | 96.00% | 55,642 | 96.00% | 56,290 | 96.00% | 52,013 | 96.00% | 61,517 | 96.00% | 63,029 | 96.00% | 63,748 | 96.50% | 179,351 | 96.18% |
| | | | | | | | | | | | | | | | | | |
| SALES/MARKETING COSTS | 277 | 0.50% | 284 | 0.50% | 290 | 0.50% | 293 | 0.50% | 271 | 0.50% | 320 | 0.50% | 328 | 0.50% | 330 | 0.50% | 932 | 0.50% |
| FOOD COST - TOTAL | 9,635 | 28.00% | 9,886 | | 9,737 | | 9,668 | 26.50% | 8,849 | 26.25% | 10,367 | | 10,622 | | 10,687 | 26.00% | 30,850 | 26.59% |
| BEVERAGE COST - TOTAL | 4,053 | 19.40% | 4,159 | | 4,248 | 19.40% | 4,309 | 19.40% | 3,889 | 19.00% | 4,600 | | 4,713 | 19.00% | 4,742 | 19.00% | 13,468 | 19.12% |
| OTHER COSTS | - | 0.00% | - | 0.00% | - | 0.00% | - | 0.00% | - | 0.00% | - | 0.00% | - | 0.00% | - | 0.00% | - | #DIV/0! |
| MISCELLANEOUS COSTS | - | | - | | - | | - | | - | | - | | - | | - | | - | #DIV/0! |
| COST OF GOOD SOLD | 13,965 | 25.25% | 14,329 | 25.25% | 14,275 | 24.63% | 14,170 | 24.17% | 13,009 | 24.00% | 15,287 | 23.86% | 15,662 | 23.86% | 15,759 | 23.86% | 45,250 | 24.27% |
| | | | | | | | | | | | | | | | | | |
| GROSS MARGIN | 39,128 | 70.75% | 40,146 | 70.75% | 41,367 | 71.37% | 42,119 | 71.83% | 39,004 | 71.99% | 46,230 | 72.14% | 47,366 | 72.14% | 47,989 | 72.64% | 134,101 | 71.90% |
| | | | | | | | | | | | | | | | | | |
| PAYROLL | - | | | | | | | | | | | | | | | | 0.00% |
| FRONT OF HOUSE | 5,641 | 10.20% | 5,675 | 10.00% | 5,622 | 9.70% | 5,512 | 9.40% | 4,876 | 9.00% | 5,639 | 8.80% | 5,515 | 8.40% | 5,417 | 8.20% | 16,573 |
| BACK OF HOUSE | 6,747 | 12.20% | 6,866 | 12.10% | 6,897 | 11.90% | 6,860 | 11.70% | 6,231 | 11.50% | 7,241 | 11.30% | 7,386 | 11.25% | 7,267 | 11.00% | 21,389 | 11.47% |
| RESTAURANT MANAGER\|CHEF | 3,558 | 6.43% | 3,558 | 6.27% | 3,558 | 6.14% | 3,558 | 6.07% | 3,558 | 6.57% | 3,558 | 5.55% | 3,558 | 5.42% | 3,558 | 5.39% | 10,673 | 5.72% |
| ALLOCATED | - | | | | | | | | | | | | | | | | |
| PAYROLL TAXES | 2,212 | 4.00% | 2,270 | 4.00% | 2,318 | 4.00% | 2,345 | 4.00% | 2,167 | 4.00% | 2,563 | 4.00% | 2,626 | 4.00% | 2,510 | 3.80% | 7,327 |
| BENEFITS | 2,046 | 3.70% | 2,100 | 3.70% | 2,145 | 3.70% | 2,169 | 3.70% | 2,005 | 3.70% | 2,371 | 3.70% | 2,429 | 3.70% | 2,444 | 3.70% | 6,900 | 3.70% |
| PAYROLL, PR TAXES & BENEFITS | 20,204 | 36.53% | 20,468 | 36.07% | 20,540 | 35.44% | 20,445 | 34.87% | 18,836 | 34.77% | 21,372 | 33.35% | 21,514 | 32.77% | 21,196 | 32.09% | 62,862 | 33.71% |
| | | | | | | | | | | | | | | | | | |
| DIRECT EXPENSES | 2,904 | 5.25% | 2,922 | 5.15% | 2,985 | 5.15% | 3,020 | 5.15% | 2,790 | 5.15% | 3,300 | 5.15% | 3,381 | 5.15% | 3,402 | 5.15% | 9,658 | 5.18% |
| ADMINISTRATION & GENERAL | 3,374 | 6.10% | 3,461 | 6.10% | 3,478 | 6.00% | 3,518 | 6.00% | 3,251 | 6.00% | 3,845 | 6.00% | 3,939 | 6.00% | 3,964 | 6.00% | 11,244 | 6.03% |
| ADVERTISING & PROMOTIONS | 2,212 | 4.00% | 2,270 | 4.00% | 2,898 | 5.00% | 1,759 | 3.00% | 1,625 | 3.00% | 1,922 | 3.00% | 1,970 | 3.00% | 1,652 | 2.50% | 5,047 | 5.12% |
| REPAIRS & MAINTENANCE | 1,106 | 2.00% | 1,702 | 3.00% | 1,739 | 3.00% | 1,759 | 3.00% | 1,625 | 3.00% | 1,922 | 3.00% | 1,970 | 3.00% | 1,982 | 3.00% | 5,812 | 3.12% |
| UTILITIES | - | 0.00% | - | 0.00% | - | 0.00% | - | 0.00% | 2,167 | 4.00% | - | 0.00% | - | 0.00% | - | 0.00% | 2,191 | 1.17% |
| RENT | | | | | | | | | 25,000 | 46.14% | | | | | | | 25,000 | 13.41% |
| OPERATING EXPENSES | 9,595 | 17.35% | 10,356 | 18.25% | 11,099 | 19.15% | 10,056 | 17.16% | 36,459 | 67.29% | 10,990 | 17.15% | 11,260 | 17.15% | 10,999 | 16.65% | 58,951 | 31.61% |
| EXPENSES | 29,800 | 53.88% | 30,824 | 54.32% | 31,639 | 54.59% | 30,500 | 52.16% | 55,296 | 102.06% | 32,362 | 50.50% | 32,774 | 49.92% | 32,195 | 48.74% | 121,813 | 65.32% |
| | | | | | | | | | | | | | | | | | |
| NET OPERATING INCOME | 9,328 | 16.87% | 9,323 | 16.43% | 9,727 | 16.78% | 11,619 | 19.82% | (16,292) | -30.07% | 13,869 | 21.64% | 14,592 | 22.23% | 15,794 | 23.91% | 12,288 | 6.59% |
| | | | | | | | | | | | | | | | | | |
| CONSULTING FEE EXPENSE | 2,765 | 5.00% | 2,837 | 5.00% | 2,898 | 5.00% | 2,932 | 5.00% | 2,709 | 5.00% | 3,204 | 5.00% | 3,283 | 5.00% | 3,303 | 5.00% | 9,324 |
| | | | | | | | | | | | | | | | | | |
| EBITDA | 6,563 | 11.87% | 6,486 | 11.43% | 6,829 | 11.78% | 8,687 | 14.82% | (19,001) | -35.07% | 10,665 | 16.64% | 11,310 | 17.23% | 12,491 | 18.91% | 2,964 | 1.59% |
| CAPEX Reserve | 553 | 1.00% | 567 | 1.00% | 580 | 1.00% | 586 | 1.00% | 813 | 1.50% | 961 | 1.50% | 985 | 1.50% | 991 | 1.50% | 2,523 | 1.35% |
| NET INCOME | 6,009 | 10.87% | 5,918 | 10.43% | 6,250 | 10.78% | 8,101 | 13.82% | (19,814) | -36.57% | 9,703 | 15.14% | 10,325 | 15.73% | 11,500 | 17.41% | 441 | 0.24% |
| **ASSET ANALYSIS** | | | | | | | | | | | | | | | | | |
| STARTING CASH | 13498 | | 19507 | | 25425 | | 31675 | | 39776 | | 19962 | | 29666 | | 39990 | | |
| CHANGE IN CASH | 6,009 | | 5,918 | | 6,250 | | 8,101 | | 19,814 | | 9,703 | | 10,325 | | 11,500 | | |
| ENDING CASH | 19507 | | 25425 | | 31675 | | 39776 | | 19962 | | 29666 | | 39990 | | 51491 | | |
| STARTING INVENTORY | 17,698 | | 18,287 | | 18,879 | | 17,736 | | 18,734 | | 18,002 | | 20,014 | | 18,761 | | |
| CHANGE IN INVENTORY | (589) | | (592) | | 1,143 | | (998) | | 732 | | (2,012) | | 1,253 | | (2,314) | | |
| ENDING INVENTORY | 18,287 | | 18,879 | | 17,736 | | 18,734 | | 18,002 | | 20,014 | | 18,761 | | 21,075 | | |
| ACCOUNTS RECEIVABLE | 16000 | | 16000 | | 16000 | | 16000 | | 16000 | | 16000 | | 16000 | | 16000 | | |
| FIXED ASSETS | 1300000 | | 1300000 | | 1300000 | | 1300000 | | 1300000 | | 1300000 | | 1300000 | | 1300000 | | |
| OTHER ASSETS | 200000 | | 200000 | | 200000 | | 200000 | | 200000 | | 200000 | | 200000 | | 200000 | | |
| TOTAL ASSET BASED AT END OF THE PERIOD | 1,553,794 | | 1,560,304 | | 1,565,411 | | 1,574,510 | | 1,553,964 | | 1,565,680 | | 1,574,751 | | 1,588,566 | | |

# EXHIBIT "2"

MARTIN J. BRILL (State Bar No. 53220)
DAVID B. GOLUBCHIK (State Bar No. 185520)
JEFFREY S. KWONG (State Bar No. 288239)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
Email: mjb@lnbyb.com; dbg@lnbyb.com; jsk@lnbyb.com

Proposed Attorneys for Chapter 11 Debtor and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>8800 LLC,<br><br>      Debtor and Debtor in Possession. | Case No. 2:18-bk-17263-RK<br><br>Chapter 11<br><br>**ORDER GRANTING DEBTOR'S EMERGENCY MOTION FOR ORDER: (1) AUTHORIZING USE OF CASH COLLATERAL ON INTERIM BASIS; AND (2) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(b)**<br><br>Date:  To Be Set<br>Time:  To Be Set<br>Place:  Courtroom 1675<br>       255 East Temple Street<br>       Los Angeles, California 90012 |

On _____, 2018, at _____.m., the Honorable Robert N. Kwan, United States Bankruptcy Judge for the Central District of California (the "Court") held a hearing (the "Hearing") in Courtroom 1675 of the United States Bankruptcy Courthouse located at 255 East Temple Street, Los Angeles, California, on the *Debtor's Emergency Motion For Order: (1) Authorizing Use Of Cash Collateral On Interim Basis; And (2) Scheduling Final Hearing Pursuant To Bankruptcy Rule 4001(b)*" [Doc. No. __] (the "Motion"), filed by 8800 LLC (the "Debtor"), the debtor and debtor in possession in the above-captioned chapter 11 bankruptcy case (the "Chapter 11 Case").  Appearances were made as set forth on the record at the Hearing.

The Court, having considered the notice of Motion, the Motion, the Memorandum,[1] the "*Omnibus Declaration of Alan Nathan in Support of First Day Motions*" [Doc. No. ___] (the "Nathan Declaration"), the Budget attached to the Nathan Declaration, all pleadings and exhibits filed in support of the Motion, the entire record and docket in this Chapter 11 Case, and the Court finding that the Debtor provided requisite notice of the Motion and the Hearing, that such notice was good and proper, that the Debtor has demonstrated that the relief requested in the Motion is necessary to prevent immediate and irreparable harm to the Debtor and its Estate, and for good cause appearing therefor,

**IT IS HEREBY ORDERED AS FOLLOWS:**

(1)     The Motion is granted in its entirety;

(2)     The Debtor is authorized to use cash collateral to pay all of the expenses set forth in the Budget, with authority to deviate from the line items contained in the Budget by up to 10% by line item and 10% in the aggregate without the need for any further Court order;

(3)     The final hearing (the "Final Hearing") on the Motion is scheduled for _____, 2018 at _____.m.

(4)     The briefing schedule for the Final Hearing shall be in accordance with the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California.

###

---

[1] Capitalized but undefined terms herein shall have the same meanings ascribed to them in the Motion and Memorandum.

# EXHIBIT "3"

**8800 LLC - DEBTOR IN POSSESSION**

| Utility Name | Type | | Account Number | Location | Bill 1 | Bill 2 | Bill 3 | Proposed Adequate Assurance of Future Payment |
|---|---|---|---|---|---|---|---|---|
| So Cal Gas | Gas | (877) 238-0092 | 30787005 | PO BOX C  Monterey Park, CA 91756 | $ 497.45 | $ 488.46 | $ 622.33 | $ 536.08 |
| Spectrum | Wifi | (866) 874-2389 | 844820031082606O | PO BOX 60074 City of Industry 91716 | $ 194.97 | $ 194.97 | $ 194.97 | $ 194.97 |
| ATT | Telephone | (800) 750-2355 | 31065266139407 | Bankruptcy Department, PO BOX 769, Arlington, TX 76004 | $ 312.98 | $ 310.03 | $ 314.28 | $ 312.43 |
| Athens Waste | Waste | (888) 336-6100 | 311170 | PO BOX 60009 City of Industry CA 91716 | $ 455.47 | $ 455.47 | $ 455.47 | $ 455.47 |
| | | | | | | | | $ - |
| | | | | | | | | $ - |
| | | | | | | | | $ - |
| | | | | | | | | $ - |
| | | | | | | | | $ - |
| TOTAL | | | | | $ 1,460.87 | $ 1,448.93 | $ 1,587.05 | $ 1,498.95 |

Exhibit 1
Adequate Assurance of Payment to Utility Companies

# EXHIBIT "4"

| Last Name | First Name | Gross Pay (Prepetition Period - 6/16 to 6/22) | Gross Pay and Employer Tax Liability (10.3%) (Prepetition Period - 6/16 to 6/22) | Title/ Position | Semi-Monthly Payroll Estimate For 6/16-6/29 (To Be Paid on July 5, 2018) | Current Status | Pay Group |
|---|---|---|---|---|---|---|---|
| Sosa | Diego | 1,923.07 | 2,121.15 | General Manager | 4,242.29 | Active | Salaried Employee |
| Barahona | Jose | 427.74 | 471.80 | Dishwasher | 1,000.21 | Active | Hourly Employees |
| Barboza | Richard | 232.65 | 256.61 | Busser | 544.02 | Active | Hourly Employees |
| Bardales | Justin | 82.28 | 90.75 | Bar Back | 192.40 | Active | Hourly Employees |
| Barnes | Nick | 31.90 | 35.19 | Server | 74.59 | Active | Hourly Employees |
| Castillo | Bladimir | 102.30 | 112.84 | Busser | 239.21 | Active | Hourly Employees |
| Cotto | Delilah | 168.95 | 186.35 | Host/Cocktail Server | 395.07 | Active | Hourly Employees |
| Crisfield | Tate | 177.76 | 196.07 | Server | 415.67 | Active | Hourly Employees |
| Diligiro | David | 174.00 | 191.92 | Cook | 406.87 | Active | Hourly Employees |
| Faircloth | Jason | 241.20 | 266.04 | Server | 564.01 | Active | Hourly Employees |
| Glennie Smith | Joss | 228.91 | 252.49 | Bartender | 535.27 | Active | Hourly Employees |
| Gonzales | Fabian | 396.99 | 437.88 | Busser | 928.31 | Active | Hourly Employees |
| Ibarra | Gisette | 209.92 | 231.54 | Cook | 490.87 | Active | Hourly Employees |
| Jackson | Emily | 432.78 | 477.36 | Host | 1,012.00 | Active | Hourly Employees |
| Kemper | Shelby | 126.50 | 139.53 | Bartender | 295.80 | Active | Hourly Employees |
| La Brie | Mackenzie | 117.15 | 129.22 | Server | 273.94 | Active | Hourly Employees |
| Martinez | Jose | 76.63 | 84.52 | Dishwasher | 179.19 | Active | Hourly Employees |
| Merida | Haymee | 293.15 | 323.34 | Busser | 685.49 | Active | Hourly Employees |
| Michales | Ryan | 152.68 | 168.41 | Bartender/Server | 357.02 | Active | Hourly Employees |
| Oz | Caner | 524.25 | 578.29 | Cook | 1,225.98 | Active | Hourly Employees |
| Palmer | Anton | 293.81 | 324.07 | Bartender | 687.03 | Active | Hourly Employees |
| Perez | Valerie | 214.92 | 237.06 | Host | 502.56 | Active | Hourly Employees |
| Phillips | Alexis | 65.56 | 72.31 | Server | 153.30 | Active | Hourly Employees |
| Reynaga | Raymond | 174.35 | 192.31 | Bartender | 407.69 | Active | Hourly Employees |
| Rodriguez | Edwin | 96.80 | 106.77 | Server | 226.35 | Active | Hourly Employees |
| Tatum | Kaleb | 181.83 | 200.56 | Server | 425.18 | Active | Hourly Employees |
| Torres | Luis | 517.67 | 570.99 | Dishwasher | 1,210.50 | Active | Hourly Employees |
| Vandervort | Paul | 123.97 | 136.74 | Bartender | 289.89 | Active | Hourly Employees |
| Villafuerte | Anthony | 553.34 | 610.33 | Manager | 1,293.91 | Active | Hourly Employees |
| Wallace | Nathan | 327.47 | 361.20 | Bar Back | 765.74 | Active | Hourly Employees |
| Weaver | William | 120.23 | 132.61 | Server | 281.14 | Active | Hourly Employees |
| Cisneros | Eduardo | 492.05 | 542.73 | Runner | 1,150.59 | Active | Hourly Employees |
| Simsek | Erdem | 590.57 | 651.40 | Cook | 1,380.97 | Active | Hourly Employees |
| Sullivan | Amber | 416.85 | 459.79 | Cook | 974.75 | Active | Hourly Employees |
| | | | | | | | |
| | | | | | | | |
| **TOTAL** | | **10,290.27** | **11,350.17** | | **23,807.82** | | |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled: **OMNIBUS DECLARATION OF ALAN NATHAN IN SUPPORT OF EMERGENCY FIRST DAY MOTIONS** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.   TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **July 2, 2018**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **David B Golubchik    dbg@lnbyb.com, dbg@ecf.inforuptcy.com**
- **United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov**
- **Hatty K Yip    hatty.yip@usdoj.gov**

**2. SERVED BY UNITED STATES MAIL**: On **July 2, 2018**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ *Service information continued on attached page*

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **July 2, 2018**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

***Served via Attorney Service***
Hon. Robert N. Kwan
United States Bankruptcy Court
Edward R. Roybal Federal Building
255 E. Temple Street, Suite 1682
Los Angeles, CA 90012

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| July 2, 2018 | Stephanie Reichert | /s/ Stephanie Reichert |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                    **F 9013-3.1.PROOF.SERVICE**