FILED & ENTERED

JAN 18 2019

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY tatum       DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>8800 LLC,<br><br>            Debtor. | Case No. 2:18-bk-17263-RK<br><br>Chapter 11<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON DEBTOR'S MOTION TO ASSUME LEASE**<br><br>Trial Date:   October 25, 2018<br>Time:         9:30 a.m.<br>Place:        Courtroom 1675<br>               Roybal Federal Building<br>               255 East Temple Street<br>               Los Angeles, CA 90012 |

The contested matter of the Motion of Debtor 8800 LLC ("Debtor" or "Tenant") to Assume Lease (the "Motion"), Electronic Case Filing Number ("ECF") 67, filed in this bankruptcy case on September 11, 2018, came on for trial before the undersigned United States Bankruptcy Judge on October 25, 2018. David B. Golubchik and Jeffrey S. Kwong, of the law firm of Levene, Neale, Bender, Yoo & Brill LLP, appeared for Debtor. Robert H. Platt and Carl L. Grumer, of the law firm of Manatt, Phelps & Phillips, LLP, appeared for TMC Realty, LLC ("TMC" or "Landlord").

On November 30, 2018, Debtor lodged its proposed findings of fact and conclusions of law for this matter, *see* ECF 112, and TMC lodged its proposed findings of fact and conclusions of law, *see* ECF 114. On December 14, 2018, Debtor filed its objections to TMC's proposed findings of fact and conclusions of law, ECF 115, and TMC

1   filed its objections to Debtor's proposed findings of fact and conclusions of law, ECF 116.

2   The court then took the matter under submission, and it is ripe for decision.

3       Having considered the evidence admitted at trial, the oral and written arguments of

4   the parties, and other admissible and relevant pleadings filed in this matter filed by Debtor

5   and TMC, the court makes the following findings of fact and conclusions of law pursuant

6   to Rule 52 of the Federal Rules of Civil Procedure, made applicable here by Rules 7052

7   and 9014(c) of the Federal Rules of Bankruptcy Procedure.

8       As set forth in detail below, the court determines that Debtor cannot assume the

9   Lease because it was terminated under California law before the date of the filing of the

10   bankruptcy petition, and Debtor is not entitled to relief from forfeiture as a matter of law.

11   Accordingly, the court need not decide the issue whether the Debtor is not the Tenant

12   under the Lease and thus would be precluded from assuming the Lease.  If it was

13   necessary for the court to determine this issue in order to resolve the Motion, the court

14   would find that Debtor is the Tenant under the Lease because, among other reasons,

15   (i) TMC (through its agents) induced Debtor and Debtor's principal, Mr. Nathan, to

16   "change its name" and is estopped from asserting otherwise, (ii) Debtor's principal, Mr.

17   Nathan, believed creation of the Debtor entity was the equivalent of what TMC was

18   directing (i.e., changing the name), (iii) Debtor and 8800 Sunset, LLC have all the same

19   attributes, i.e., the same assets, the same liabilities, the same principals and the same

20   business, (iv) TMC waived its objection to the assignment of the Lease to Debtor by,

21   among other things, sending invoices in the name of and receiving rent payments from

22   Debtor from the Lease commencement date of December 1, 2015 to April 2018, and

23   (v) the unauthorized assignment of the Lease from 8800 Sunset to Debtor would

24   constitute an "Event of Default" under Section 14.1(g) of the Lease, and Debtor could

25   likely get relief from such a forfeiture caused by Debtor's default, *see* California Code of

26   Civil Procedure § 1179.

27

28

## I.    FINDINGS OF FACT

**A.    Background and Parties**

1.    On June 22, 2018 (the "Petition Date"), Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C.  Declaration of Alan Nathan ("Nathan Declaration"), ECF 98, ¶ 4.  Debtor is a California limited liability company operating its business, managing its financial affairs and operating its bankruptcy estate as a debtor in possession.  *Id.*; *see* TMC's Exhibit YY (Debtor's complaint for damages and declaratory relief).

2.    TMC is a Delaware limited liability company, and it owns and operates an office building located at 8800 Sunset Boulevard, West Hollywood, California (the "Building").  Declaration of Jason Stewart ("Stewart Declaration"), ECF 99, ¶ 4.

3.    IAC/InterActiveCorp is the parent company of IAC Group, LLC (collectively, "IAC"), which is the parent company of TMC.  Stewart Declaration, ¶ 1.

4.    Debtor currently operates its business within a portion of the Building (the "Premises"), and purports to occupy the Premises pursuant to the "*Restaurant Lease*" dated December 13, 2013 (as amended, the "Lease").  Nathan Declaration, ¶ 7; Debtor's Exhibit 1 and TMC's Exhibit A (Lease).[1]

5.    Debtor owns and operates an entertainment facility on the Premises that includes a fine dining restaurant specializing in Italian-American fare, known as "Estrella"; a semi-secret lounge for cocktail receptions, social events, and live entertainment, known as the "Ma Lounge"; and a state-of-the-art theatre that was used for private screenings and events, known as the "Ma Theatre" (collectively, the "Entertainment Facility").  Nathan Declaration, ¶ 5.

6.    Debtor has approximately 34 employees, a loyal customer base, and has invested substantial amounts of money (over $2 million) into its business and improving the Premises.  *Id.*, ¶ 6.

---

[1] The Lease was admitted into evidence at trial as Debtor's Exhibit 1 and as TMC's Exhibit A and is referenced and cited to herein simply as "Lease."

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

7.      Alan Nathan is the managing member of both Debtor and another limited liability company with a similar name, 8800 Sunset, LLC ("8800 Sunset").  *Id.*, ¶¶ 2 and 7. Mr. Nathan is the person at Debtor and 8800 Sunset in charge of any final decisions with regard to lease documents, and he is the primary person at Debtor and 8800 Sunset that corresponded with TMC and its agents with regard to the Lease.  *Id.*, ¶ 3.

8.      The Lease was entered into between TMC and 8800 Sunset.  Lease at page "i".  The Lease has an initial term of ten years, with two five-year options to extend.  *Id.*, §§ 3.1 and 3.2.

9.      Debtor's principal and managing member, Mr. Nathan, negotiated the Lease on behalf of 8800 Sunset along with its attorney, Andrew Kirsch, of the law firm of Sklar, Kirsch, LLP.  Stewart Declaration, ¶ 5.  Landlord TMC was represented in the negotiations by its attorney, Patrick Ramsey, of the law firm of Paul Hastings, LLP.  *Id.*  Throughout the Lease negotiation process, Mr. Nathan's business contact at TMC was Christian Bryan. Nathan Declaration, ¶ 8.  Mr. Nathan did not negotiate Lease terms with anyone at TMC other than Mr. Bryan.  *Id.*  Mr. Bryan told Mr. Nathan that he was the Landlord TMC's authorized agent for purposes of the Lease and the operations related thereto.  *Id.*  Mr. Bryan executed the Lease on behalf of the Landlord TMC.  Lease at p. 24.  During the negotiations, Mr. Nathan represented that he had successfully operated or managed many restaurants during his career.  Stewart Declaration, ¶ 8.  The Lease was signed on behalf of 8800 Sunset LLC by Mr. Nathan as its Managing Member.  Lease at p. 24.

10.     The Lease contains several provisions prohibiting amendments, changes, or modifications, as well as assignments or transfers, without, among other things, a written amendment signed by both parties.  Stewart Declaration, ¶ 10; Lease, § 21.1 ("This Lease shall not be amended, changed or modified in any way unless in writing executed by Landlord and Tenant.").

11.     The Lease also contains a provision for the Landlord TMC to "recapture" and terminate the Lease, but only upon the satisfaction and occurrence of several conditions required therein (the "Recapture Provision").  Lease, §§ 13.2-13.4.  Under the Recapture

Provision, if the tenant under the Lease requests TMC's consent to assign or transfer the tenant's interest under the Lease, TMC, "in the exercise of its sole and absolute discretion," has the option (the "Recapture Right") to terminate the Lease and recapture the Premises.  *Id.*, § 13.3.

12.    Specifically, Section 13.3 of the Lease provides that "[a]t any time within twenty (20) business days after Landlord's receipt of all (but not less than all) of the information and documents described in Section 13.2, Landlord may . . . terminate this Lease."  *Id.*  The "information and documents described in Section 13.2" of the Lease include:

a.  the name and address of the proposed Transferee;

b.  current financial statements of the proposed Transferee certified by an officer, partner, manager or owner thereof, and any other information and materials (including, without limitation, credit reports, business plans, operating history, bank and character references) required by Landlord to assist Landlord in reviewing the financial responsibility, character, and reputation of the proposed Transferee;

c.  the nature of such Transferee's business, restaurant plan and proposed use of the Premises;

d.  the proposed effective date of the proposed Transfer;

e.  all of the principal terms of the proposed Transfer (including a calculation of the Transfer Profits (defined in Section 13.5, below));

f.  description of such Transferee's track record and experience in operating restaurants of comparable scope and quality; and

g.  such other information and materials as Landlord may in good faith request (provided, that if Landlord requests such additional information or materials, the Transfer Notice shall not be deemed to have been received until Landlord receives such additional materials).

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

1  *Id.*, § 13.2.  Section 13.2 of the Lease also provides that "[i]f Tenant modifies any of the

2  terms and conditions relevant to a proposed Transfer specified in the Transfer Notice,

3  Tenant shall re-submit such Transfer Notice to Landlord for its consent pursuant to all of

4  the terms and conditions of this Article 13."  *Id.*

5  **B.    The Tenant's Name Controversy**

6         13.    Not long after the execution of the Lease, an incident occurred that

7  prompted Mr. Nathan to consider changing the name of the Tenant under the Lease.

8  Stewart Declaration, ¶ 11.  On behalf of 8800 Sunset, Mr. Nathan received a state court

9  complaint against the Landlord and 8800 Sunset related to a slip-and-fall injury in the

10 Building but not on the Premises (the "Slip and Fall Lawsuit").  Nathan Declaration, ¶ 9.

11 Mr. Nathan was advised by Mr. Bryan of TMC that the Landlord TMC would handle the

12 Slip and Fall Lawsuit on behalf of 8800 Sunset, which was likely named as a defendant in

13 the lawsuit because its name contained the building address and may have appeared to

14 others as the owner of the building.  *Id.*  Although Landlord TMC obtained a dismissal of

15 the Slip and Fall Lawsuit against 8800 Sunset, *see* Debtor's Exhibit 2 (Los Angeles

16 Superior Court's entry of dismissal of the lawsuit), Mr. Bryan of TMC nevertheless advised

17 Mr. Nathan to change the name of the tenant entity operating on the Premises so that a

18 similar incident would not occur again in the future.  *Id.*; Debtor's Exhibit 3 and TMC's

19 Exhibit D (emails dated 3/5/14 regarding name change); Transcript Regarding Hearing

20 Held 10/25/18 ("Trial Transcript"), ECF 111, 117:13-16 ("Q. Now, he says, it will be good

21 to do this.  You respond, 'I filed to get the name.'. . . Without the Sunset.  And then he

22 responds, "Either way, your call.  Will likely need to do a short amendment to the lease.'").

23 Specifically, Mr. Bryan wrote to Mr. Nathan, "It would be good for going forward to not

24 make mention of the address in your company name to avoid this type of issue."  Debtor's

25 Exhibit 3 and TMC's Exhibit D (emails dated 3/5/14 regarding name change); *see* Nathan

26 Declaration, ¶ 11.

27        14.    Mr. Nathan was "happy" to continue having "8800 Sunset LLC" operate the

28 restaurant, and he had no intention of or reason for creating the Debtor entity but for the

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

fact that Mr. Bryan, Landlord TMC's representative, advised that he change the name of
"8800 Sunset LLC" after the Landlord successfully obtained dismissal of the Slip and Fall
Lawsuit.  Nathan Declaration, ¶ 10; Trial Transcript 116:22-24 (Mr. Nathan's
testimony)("There's no reason I need to change the name without the landlord asking me
to do so."); Trial Transcript 174:17-21 ("THE COURT: All right.  So the only purpose was
just to please the landlord and accommodate the landlord's suggestion?  THE WITNESS
[Mr. Nathan]: Yeah, he seemed to think that lawsuits happen –"); Trial Transcript 174:24-
25 to 175:1 ("THE COURT: You – right.  You wouldn't have changed the name otherwise,
right?  THE WITNESS: No, I was happy with that.").

15.    In a subsequent email sent to Mr. Nathan by Mr. Bryan of TMC on March 5,
2014 at 8:58 a.m., Mr. Bryan reiterated, "Maybe [a name change] without the address.
From what I gather this is what people look for when suing and then name the[m] in the
suit regardless of the cause.  Either way your call.  We'll likely need to do a short
amendment to the lease."  Nathan Declaration, ¶ 12; Debtor's Exhibit 3 and TMC's Exhibit
D (emails dated 3/5/14 regarding name change).

16.    Relying on Mr. Bryan's directive, Mr. Nathan almost immediately and on the
same day as Mr. Bryan's March 5, 2014 emails created the Debtor entity (dropping
"Sunset" from the name) with the intention of having Debtor operate the Entertainment
Facility on the Premises.  Nathan Declaration, ¶ 13; Debtor's Exhibit 4 (Debtor's Articles of
Organization of a Limited Liability Company).

17.    Mr. Nathan notified the Landlord's representative, Mr. Bryan, of Debtor's
creation and sent an email to Mr. Bryan on March 5, 2014 at 11:50 a.m. stating that "I filed
to get the name 8800 without the sunset."  Nathan Declaration, ¶ 13; Debtor's Exhibit 3
and TMC's Exhibit D (emails dated 3/5/14 regarding name change); Trial Transcript
171:23-25 ("A: No, it was just, 'Will you change the name?'  I sent an email to say that I
filed for a new company and the address is out of it and he was happy with it.").

18.    Upon creation of Debtor, the 8800 Sunset entity was not used for any
purpose and did not conduct any business on the Premises or otherwise.  Trial Transcript

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

1   173:9-21 ("THE COURT: So did 8800 Sunset have any purpose after you created 8800,

2   LLC?  THE WITNESS [Mr. Nathan]: No purpose at all . . . . THE COURT: So the only

3   purpose was – it was just a replacement for . . . 8800 Sunset?  THE WITNESS:  That's

4   correct.").

5   **i.**       **Communications About the Tenant's Name**

6           19.     The following matters are relevant in assessing Landlord TMC's

7   understanding regarding the identity of its tenant under the Lease:

8           a.      **The Liquor License.**  Section 6.4(c) of the Lease provides that "[o]n

9   or about the date of the Business Opening . . . Landlord or its Affiliate shall assign,

10  sell and transfer the Liquor License [(the "Liquor License")] . . . to Tenant for use in

11  connection with Tenant's operation of the Restaurant within the Premises."  Lease,

12  § 6.4(c).  On March 31, 2014, Mr. Bryan of TMC described a two-step process of

13  transferring the Liquor License once from TMC's affiliate "to TMC . . . and then

14  again to the new owners, 8800, LLC."  Nathan Declaration, ¶ 22; Debtor's Exhibit 8

15  (email dated 3/31/14 regarding transfer plans for the Liquor License).  The Liquor

16  License was transferred to Debtor pursuant to the receipt of certain documents—

17  escrow instructions, a demand note, the California Department of Alcoholic

18  Beverage Control's notice of intended transfer of liquor license form, a license

19  transfer request form, and the Rule 64(b) Request letter—all of which were

20  prepared by TMC and show that the buyer or transferee applicant was Debtor.

21  Nathan Declaration, ¶ 22; Debtor's Exhibit 10 (escrow package submitted by TMC

22  for the transfer of the Liquor License to Debtor).  Thus, the Liquor License was

23  transferred from TMC's affiliate to Debtor, and the Liquor License is currently in

24  Debtor's name.  Nathan Declaration, ¶ 25; Debtor's Exhibit 11 (Debtor's Liquor

25  License).

26          b.      **Common Use Letter.**  In response to a request from the Public

27  Health Department on June 18, 2014, *see* Debtor's Exhibit 15, Mr. Bryan signed a

28  common use letter under IAC letterhead stating in pertinent part, "the food facility to

-8-

be operated by 8800, LLC."  Nathan Declaration, ¶ 30; Debtor's Exhibit 16 (IAC

Common Use Letter).  A subsequent and revised common use letter signed by Mr.

Bryan under TMC letterhead also represented that Debtor would operate on the

Premises.  Nathan Declaration, ¶ 31; Debtor's Exhibit 17 (email from Mr. Bryan to

Mr. Nathan to "Pls [sic] use this shared use restroom letter."); Debtor's Exhibit 18

(revised common use letter under TMC letterhead).

   c. **The Termination Option.**  Several months after the Liquor License

was transferred to Debtor, Mr. Bryan asked Mr. Nathan to confirm that he was

willing to waive the termination option related to the Liquor License.  Nathan

Declaration, ¶ 26.  As a result, on October 29, 2014, Mr. Nathan sent Mr. Bryan an

email stating that "8800 LLC . . . as the tenant under that certain Restaurant Lease

entered into with TMC REALTY, LLC . . . hereby waives any right to terminate said

lease pursuant to Section 6.4."  *Id.*; Debtor's Exhibit 12 (emails dated 10/29/14

regarding waiver of the termination option).  Mr. Nathan's response was

subsequently forwarded by Mr. Bryan to Jason Stewart, Senior Vice President and

Chief Administrative Officer of IAC/Interactive Corp., the parent of IAC Group, LLC

(referred to collectively as "IAC"), which is the parent of Landlord TMC.  Debtor's

Exhibit 12A (email dated 10/29/14 forwarding Mr. Bryan's waiver email); Stewart

Declaration, ¶ 1 ("I am Senior Vice-President and Chief Administrative Officer of

IAC/Interactive Corp").  In response to Mr. Nathan's October 29, 2014 email, Mr.

Bryan sent an email replying to Mr. Nathan, which stated: "Thanks . . . I'm going to

have legal draft a letter for us to counter sign on this point to make it official."

Debtor's Exhibit 12 (emails dated 10/29/14 regarding waiver of the termination

option).

   d. **First Lease Amendment.**  On October 30, 2014, Mr. Bryan of TMC

sent an email to Mr. Nathan with the subject "First Amendment of Restaurant

Lease (IAC)" with the attachment of a proposed version of the first amendment to

the Lease to waive the termination option pursuant to Section 6.4 of the Lease if

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

the tenant could not obtain a Liquor License (the "First Amendment").  Nathan

Declaration, ¶ 27; Debtor's Exhibit 14 and TMC's Exhibit C (email dated 10/30/14

with the proposed version of the First Amendment); Debtor's Exhibit 13 and TMC's

Exhibit B (First Amendment).  Despite the fact that Mr. Nathan's email regarding

waiver of the termination option referenced "8800, LLC . . . as tenant," and that the

Liquor License was transferred to Debtor, the First Amendment that was sent by

Mr. Bryan of TMC to Mr. Nathan, and executed by Mr. Nathan and Mr. Bryan,

references 8800 Sunset as the tenant.  Debtor's Exhibit 12 (emails dated 10/29/14

regarding waiver of the termination option); Debtor's Exhibit 11 (Debtor's Liquor

License); Debtor's Exhibit 13 and TMC's Exhibit B (the First Amendment).  Prior to

signing the First Amendment, Mr. Nathan was asked to review a draft of the First

Amendment and to advise TMC if it was acceptable.  Debtor's Exhibit 14 and

TMC's Exhibit C (email dated 10/30/14 with the proposed version of the First

Amendment).

     e.     On October 20, 2015 at 7:20 a.m., Shane Trent, Director of LA

Facilities at IAC, sent an email to Brian Murphy of IAC to inform him that he sent a

"commencement notice to Choice Hospitality (Estrella Restaurant tenant) last

month [and] . . . a reminder that payment in the amount of $69,300 was due."

Nathan Declaration, ¶ 32; Debtor's Exhibit 19 (emails dated 10/20/15 from Mr.

Trent to Mr. Murphy).  Mr. Trent then replied to this email with a clarification that

"[t]hey operate under the name 8800, LLC" at the Premises.  *Id.*  In response to Mr.

Trent's reminder, Debtor made the payment with a check in Debtor's name, and

TMC cashed the check on October 27, 2015.  Nathan Declaration, ¶ 33; Debtor's

Exhibit 20 (delivery date check in the amount of $69,300).

     f.     On November 11, 2015 at 8:22 a.m., shortly before Debtor opened for

business and the Lease commenced on December 1, 2015, Mr. Nathan thought

that he had misplaced the document showing that Debtor was the tenant under the

Lease and decided to email Mr. Trent (successor to Mr. Bryan) for him to draft a

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

"small amendment to this agreement and the [L]ease so that the company is 8800 llc not 8800 sunset llc."  Nathan Declaration; ¶ 14; Debtor's Exhibit 3 and TMC's Exhibit D (emails dated 11/11/15 regarding name change).  In an email response on November 30, 2015 at 8:33 a.m., Mr. Trent told Mr. Nathan that he would "work on th[e amendment]." Debtor's Exhibit 3 and TMC's Exhibit D (emails dated 11/11/15 regarding name change).  In that same email Mr. Trent also requested from Mr. Nathan a "wet copy of the lease commencement letter."  *Id.*  Under the "lease commencement letter" referred to in Mr. Trent's email, Mr. Nathan signed on behalf of "8800 Sunset LLC" and not "8800 LLC."  TMC's Exhibit VVV (Notice of Lease Term Dates).

g.    **Second Lease Amendment.**  As time went by, Debtor desired to lease additional office space on the Premises (the "Additional Office Space"). Nathan Declaration, ¶ 57.  The purpose for the Additional Office Space was so that Debtor's affiliated entity Sweetfin Holdings, LLC ("Sweetfin") could use it as an office, and this was communicated by Mr. Nathan to Elizabeth McDonald of IAC. Trial Transcript 210:5-9 ("THE WITNESS [Mr. Nathan]: Yes.  So there were two other ones, [Sweetfin] Holdings, which we wanted to rent the – an office and occupied [Sweetfin] Holdings. From that amendment, that portion of the office, [Sweetfin] Holdings and a check to the landlords."); Trial Transcript 113:5-8 ("A. [Sweetfin] Holdings and – yes, I had conversation with Elizabeth in regards to it so I asked her if they would be okay if [Sweetfin] Holdings rented an office.").  Mr. Nathan engaged in negotiations with TMC for the payment of rent related to Sweetfin's usage of the Additional Office Space.  Nathan Declaration, ¶ 57.  After TMC and Debtor finalized the essential terms regarding the Additional Office Space, the Landlord formalized these terms and drafted the Second Amendment to the Lease dated October 13, 2016 (the "Second Amendment").  *Id.*, ¶ 58; Debtor's Exhibit 45 and TMC's Exhibit F (the Second Amendment).  When the Second Amendment was emailed to Mr. Nathan from Ms. McDonald for signature on

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

1    October 7, 2016, the body of the email stated that the company name "used [in the

2    Second Amendment was] 8800LLc," and asked for Mr. Nathan's confirmation that

3    "8800LLc" could be used in the Second Amendment instead of the "requested

4    [Choice Hospitality Group, or] CHG" name.  Nathan Declaration, ¶ 59, Debtor's

5    Exhibit 46 and TMC's Exhibit I (emails dated 10/7/16 regarding the Second

6    Amendment).  However, like the First Amendment, the Second Amendment recited

7    that "8800 Sunset LLC" was the Tenant under the Lease and was again signed on

8    behalf of "8800 Sunset LLC" by Mr. Nathan.  Debtor's Exhibit 45 and TMC's Exhibit

9    F (the Second Amendment).

10         h.    **Third Lease Amendment.**  Starting in early 2017, Debtor was facing

11    financial difficulties.  Nathan Declaration, ¶ 60.  The Lease had provisions for

12    increases in yearly rent.  Lease, § 4.1.  Mr. Bryan and Mr. Shane were no longer

13    employed by TMC.  Nathan Declaration, ¶ 60.  Their superior, Mr. Stewart, became

14    Mr. Nathan's contact.  *Id.*  In an email dated February 15, 2017 with the subject

15    "RE: Copy of Estrella 2016 PL w rent increase.xlsx," Mr. Nathan asked Mr. Stewart

16    to "push [the] rent increase [back] till next year."  *Id.*; Debtor's Exhibit 47 (email

17    dated 2/15/17 regarding rent increase).  Mr. Stewart told Mr. Nathan that he agreed

18    to delay the rent increase.  Nathan Declaration, ¶ 61; *see* Debtor's Exhibit 48 (email

19    dated 3/20/17 from Ms. McDonald regarding deferment of the rent increase).  In an

20    email from Ms. McDonald to Mr. Nathan with the subject "Third Amendment of

21    Restaurant Lease (IAC)_8906924_2.doc" on March 20, 2017, she told Mr. Nathan

22    that Mr. Stewart asked that the Landlord and Debtor "memorialize the deferment of

23    the rental increase so please see attached amendment."  Debtor's Exhibit 48 (email

24    dated 3/20/17 from Ms. McDonald regarding deferment of the rent increase).  The

25    third amendment to the Lease dated December 1, 2016 (the "Third Amendment")

26    was signed by Mr. Nathan and sent bank to Ms. McDonald.  Debtor's Exhibit 49

27    and TMC's Exhibit J (the Third Amendment).  The Third Amendment, like the two

28    previous amendments that Mr. Nathan signed, once again recited that "8800

-12-

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Sunset LLC" was the tenant under the Lease and was signed on behalf of "8800

Sunset LLC" by Mr. Nathan.  *Id.*

      i.     Even after the date of the Third Amendment, the Landlord sent a

check payable to Debtor in the amount of $30,172.50 for tenant reimbursement

owed to the tenant pursuant to the Lease.  Nathan Declaration, ¶ 64; Debtor's

Exhibit 30 (check dated 1/9/17 for reimbursement).  Further, the Landlord

continued to send Lease invoices to Debtor, and Debtor continued to send Lease

payments that were cashed by the Landlord until April 2018 – approximately fifteen

months after the Third Amendment was entered into and just two months before

the Petition Date.  Nathan Declaration, ¶ 65; Debtor's Exhibit 36 (IAC lease

invoices from 12/2/15 to 3/26/18); Debtor's Exhibit 38 (rent checks sent by Debtor

to TMC from 12/4/15 to 9/5/18).

      j.     Landlord TMC worked with Debtor (regarding Landlord approval,

consent, or signoff) to apply for and obtain several permits and licenses for Debtor

to operate the Entertainment Facility on the Premises, Nathan Declaration, ¶ 34:

    (i)  TMC applied for an Industrial Waste Permit on behalf of Debtor under the

        name "8800, LLC."  *Id.*; Debtor's Exhibit 21 (emails regarding the

        Industrial Waste Permit).  Debtor issued a check in the amount of

        $1,226.00 to the "LA County Department of Public Works Industrial

        Waste Department" for fees related to Industrial Waste Permit, and TMC

        paid Debtor back for such fees.  Nathan Declaration, ¶ 34; Debtor's

        Exhibit 21 (check to the Industrial Waste Department from Debtor).

    (ii)  With TMC's permission and authorization, Debtor submitted an

        application to the County Sanitation Districts of Los Angeles to allow for,

        among other things, the "change in use of [part of the Premises] from

        office to restaurant."  Nathan Declaration, ¶ 35; Debtor's Exhibit 22

        (application submitted to the County Sanitation Districts of Los Angeles).

        The application states that the owner of the Premises is "TMC REALTY

-13-

HOLDINGS CO," and that the applicant is "IAC – 8800 LLC."  Debtor's

Exhibit 22 (application submitted to the County Sanitation Districts of Los

Angeles).

(iii)   To obtain authorization for the demolition and remodel of the Premises

for Debtor's tenant improvements ("Tenant Improvements" or "TI"), a

form was submitted to the City of West Hollywood listing the project

name as "8800 LLC," and it was signed by Mr. Bryan of TMC.  Nathan

Declaration, ¶ 36; Debtor's Exhibit 23 (City of West Hollywood's

Construction and Demolition Waste Management Short Form).  After

certain of the Tenant Improvements were completed, Mr. Nathan had to

submit requests to, and obtain approval for, reimbursements from the

Landlord for Debtor's qualifying Tenant Improvements to the Premises.

Nathan Declaration, ¶ 37.

k.      In preparation for Lease commencement, Debtor did all the following

under the name "8800 LLC": obtained the necessary business and restaurant

permits and licenses, *see* Debtor's Exhibit 33 (8800 LLC Business License,

Alcoholic Beverage License, and Public Health Permit); applied and obtained

utilities to operate the Entertainment Facility on the Premises, pursuant to Section

7.1 of the Lease, *see* Debtor's Exhibit 34 (8800 LLC's bills from AT&T and

SoCalGas); obtained insurance for the Premises, as required by Section 10.2 of

the Lease, *see* Debtor's Exhibit 35 (Certificate of Liability Insurance from ACORD);

and filed all tax returns, as it relates to business operations for the Entertainment

Facility on the Premises.  Nathan Declaration, ¶ 47.

l.       **Tenant Improvements.**  In an email dated April 24, 2015, Mr. Nathan

for Debtor confirmed "Yes , that is correct" to Mr. Trent's request for Landlord that

he "verify the remit to info for the [Tenant Improvements] check: 8800, LLC 1301 N.

Harper Avenue, . . . Los Angeles, CA 90046."  Nathan Declaration, ¶ 38; Debtor's

Exhibit 24 (email dated 4/24/15 regarding the address for the TI check).  On May 5,

-14-

1    2015, at 8:45 a.m., Mr. Bryan sent an email with the subject "RE: Check Request -

2    Tenant Improvement reimbursement - Estrella Restaurant - 4/24/15" stating that

3    the Tenant Improvements reimbursement check "should be made out to 8800LLC

4    since that is the entity in which we have a lease."  Nathan Declaration, ¶ 39;

5    Debtor's Exhibit 25 (email dated 5/5/15 regarding TI reimbursement check request).

6    This email also stated that Mr. Bryan would attempt to get a W9 tax form from Mr.

7    Nathan.  *Id.*  As a result, Mr. Bryan sent Mr. Nathan a subsequent email on May 5,

8    2015 at 8:46 a.m., requesting that Mr. Nathan send him a "W9 version 2014 for

9    8800 LLC . . . [so that he could] have a check cut for the reimbursement."  Nathan

10   Declaration, ¶ 40; Debtor's Exhibit 26 (email dated 5/5/15 from Mr. Bryan to Mr.

11   Nathan requesting a W9).  Mr. Trent of IAC then sent an email to the accounts

12   payable department at IAC stating that Debtor's "Updated w9 [is] attached."

13   Nathan Declaration, ¶ 41; Debtor's Exhibit 26A (email dated 5/6/15 from Mr. Trent

14   with 8800 LLC's W9 attached).  In an email correspondence chain with the subject

15   "Check Request - Tenant Improvement reimbursement - Screening Room -

16   8/20/15," Mr. Trent stated that he was "submitting this check request for Tenant

17   Improvements to 8800, LLC (Estrella Restaurant tenant) for improvements made to

18   the 8800 Screening Room. . . in the amount of $135,000."  Nathan Declaration,

19   ¶ 42; Debtor's Exhibit 27 (email chain dated from 8/20/15 to 8/25/15 regarding TI

20   reimbursement check request).  Mr. Bryan of TMC responded, "Approved.  I've

21   reviewed the detail back up," and Mr. Stewart of IAC replied by stating, "Ok."  *Id.*  In

22   another email from Mr. Trent dated August 31, 2015, he stated that he was

23   "submitting this request for Tenant reimbursement to 8800, LLC (Estrella

24   Restaurant tenant) for improvements" in the amount of $71,766.  Nathan

25   Declaration, ¶ 43; Debtor's Exhibit 28 (email dated 8/31/15 regarding TI

26   reimbursement check request). In a subsequent email from Mr. Trent dated

27   October 6, 2015, he attached a copy of a TI reimbursement check and informed

28   Kate Sigman of IAC "[t]he vendor is 8800 LLC – this is a TI reimbursement to our

-15-

restaurant tenant." Nathan Declaration, ¶ 44; Debtor's Exhibit 29 (email dated 10/6/15 from Mr. Trent with attached check request). In a further email dated December 22, 2015 from Mr. Trent to Michael Cheah related to TI reimbursements, Mr. Trent notified Mr. Cheah about "a notice of intent on lien related to our restaurant tenant's recent construction work." Nathan Declaration, ¶ 45; Debtor's Exhibit 31 (email dated 12/22/15 regarding notice of intent to record a mechanics' lien). The email asked for guidance on "next steps if any" given that the "restaurant tenant, dba 8800, LLC, received 2 separate TI disbursements related to their construction project earlier this year." *Id.* In this email, Mr. Trent of IAC stated, "I submitted a check request for Tenant Improvement reimbursement to 8800, LLC (Estrella Restaurant tenant) for improvements made to the 8800 Screening Room on 8/20." *Id.* Mr. Trent of IAC also stated in the same email, "I submitted a check request for Tenant Improvement disbursement to 8800, LLC (Estrella Restaurant tenant) for improvements made to the restaurant space on 4/24." *Id.*

m.    Attorney Randall Fink replaced Mr. Kirsch as Debtor's counsel. *See* TMC's Exhibit N (letter to counsel for TMC dated 11/27/17 from Mr. Fink). On November 27, 2017, Mr. Fink sent a letter to counsel for TMC stating that his firm "represents 8800 Sunset LLC." *Id.* As late as May 3, 2018, after TMC had given notice of its termination of the Lease and recapture of the Premises, Mr. Fink wrote another email with the subject line: "8800 Sunset LLC (Estrella)." TMC's Exhibit HH (email dated 5/3/18 between Mr. Fink and Mr. Platt).

n.    On May 16, 2018, Landlord TMC filed an unlawful detainer action against 8800 Sunset LLC and Doe Defendants in the Los Angeles Superior Court (the "Unlawful Detainer Action"). Stewart Declaration, ¶ 36; TMC's Exhibit ZZ (Complaint – Unlawful Detainer dated 5/16/18). The Complaint in that action named as a defendant, and was served upon, 8800 Sunset LLC, the entity named in the Lease as Tenant and each of the three Lease Amendments. *Id.* After the Unlawful Detainer Action was filed, Mr. Fink, Debtor's counsel, told TMC that the

1    Tenant under the Lease was "8800, LLC" rather than "8800 Sunset LLC"  TMC's

2    Exhibit AAAAA (emails dated 5/18/18 regarding the name change).  When asked

3    whether this contention was supported by a written assignment of the Lease, Mr.

4    Fink, counsel for Debtor, responded "[w]hether there is a more formal amendment

5    or not, I do not know.  I don't have one."  *Id.*  In response, on May 22, 2018, TMC

6    filed an Amended Complaint in the Unlawful Detainer Action, adding Debtor as a

7    Defendant.  TMC's Exhibit BBB (first amended Complaint – Unlawful Detainer

8    dated 5/22/18).

9    **ii.    Invoices and Rent Payments**

10   20.    From the date the lease commenced on December 1, 2015, to April 2018,

11   TMC sent Lease invoices addressed to Debtor.  Debtor's Exhibit 36 (IAC lease invoices

12   from 12/2/15 to 3/26/18).  None of the Lease invoices were addressed to 8800 Sunset.  *Id.*

13   21.    On December 2, 2015, Mr. Trent of IAC sent an email to TMC stating that

14   TMC's "8800 Restaurant tenant (Estrella/Choice Hospitality/8800 LLC) should receive the

15   first monthly invoice asap.  Their lease agreement states rent commences Dec 1st."

16   Nathan Declaration, ¶ 49; Debtor's Exhibit 37 (email dated 12/2/18 regarding first monthly

17   invoice for Debtor).

18   22.    Upon receiving monthly Lease invoices from the Landlord addressed to

19   Debtor, it was Debtor—and not 8800 Sunset—who paid rent, as provided for in the Lease,

20   to the Landlord.  Nathan Declaration, ¶ 50; Debtor's Exhibit 38 (rent checks sent by

21   Debtor to TMC from 12/4/15 to 9/5/18).  From the date the lease commenced on

22   December 1, 2015 to April 2018, Debtor sent checks (which were signed by Mr. Nathan)

23   to the Landlord for rent pursuant to the Lease, which the Landlord cashed without

24   objection.  *Id.*  When Debtor's checks were returned, Ms. McDonald of IAC notified Mr.

25   Nathan, on behalf of Debtor, that this was the case.  Nathan Declaration, ¶ 50; Debtor's

26   Exhibit 39 (email from Ms. McDonald forwarding to Mr. Nathan an email dated 12/27/17

27   from another IAC employee stating that "our cash deposit for December rent from 8800

28   LLC has been returned.").

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

23.    Excluding the payments for the usage of the Additional Office Space described in the Second Amendment, *see* Debtor's Exhibit 45 (the Second Amendment), Lease payments were always made by Debtor.  Trial Transcript 210:12-16 ("THE COURT: So how many – what percentage of checks were. . . made out by other parties other than 8880 to pay the rent?  THE WITNESS [Mr. Nathan]: To pay the rent for the restaurant, only 8800, LLC.").

24.    With respect to the check in the name of "SMOKEYARD, INC." in the amount of $22,466.00 and dated December 1, 2016 that was addressed to TMC, this check was "[r]eplaced by check 11837," a check written by Debtor.  TMC's Exhibit L (SMOKEYARD, INC. rent check); Debtor's Exhibit 38 (Debtor's replacement check dated 12/1/16 for $22,466.00).  The Smokeyard check was inadvertently sent from Debtor's accountant (and not Debtor) to the Landlord.  Trial Transcript 111:4-9 (Mr. Nathan's testimony) ("Q.  Sure.  You sent rent checks into the tenant using different names, correct?  A.  For the main restaurants we – sent from 8800, LLC there was a mistaken check that came from the accountant called Smokeyard, which is not my company.  I've nothing to do with it.").

25.    With respect to the checks addressed and sent to the Landlord from Sweetfin that were cashed by the Landlord, these were payments made by Sweetfin for its usage of the Additional Office Space pursuant to the Second Amendment.  Trial Transcript 111:9-11 ("And [Sweetfin] Holdings checks specifically for the second amendment and the office on the first floor."); Trial Transcript 210:5-9 ("THE WITNESS [Mr. Nathan]: . . . [Sweetfin] Holdings, which we wanted to rent the – an office and occupied [Sweetfin] Holdings.  From that amendment, that portion of the office, [Sweetfin] Holdings and a check to the landlords.").

26.    Prior to the execution of the Second Amendment, Mr. Nathan notified Ms. McDonald of IAC that it was Sweetfin that desired to use the Additional Office Space. Trial Transcript 105:23 to 106:3 (Mr. Nathan's testimony) ("A.  I actually asked for the lease to be in the [Sweetfin] for the holdings.  There's an email before this for Elizabeth

-18-

and she said that Barry Diller is making a decision and they got – wanted an outside tenant that they don't know already. And then she's asking me instead of Sweet –"); Trial Transcript 113:5-13 ("A. [Sweetfin] Holdings and – yes, I had conversation with Elizabeth in regards to it so I asked her if they would be okay if [Sweetfin] Holdings rented an office. Again, she came back to say that Barry Diller did not want to rent to anyone who he's not aware of and she's happy to rent it to us.  And again, you saw the two names: Choice Hospitality Group, which is a management group that they're comfortable with that runs Estrella and 8800, LLC, which is the tenant's name.").

27.    Section 1 of the Second Amendment provides that the "Base Rent for the Additional Premises shall be $7,800.00 per annum," i.e., monthly payments of $650. Debtor's Exhibit 45 and TMC's Exhibit F, § 1 (the Second Amendment).  From December 2016 through April 2018, the Lease Invoices had separate line item descriptions with a notation "Additional space" for those amounts billed for the Additional Office Space. Debtor's Exhibit 36 (IAC lease invoices from 12/2/15 to 3/26/18).  Each of the "Base Rent Charge[s]" that were billed for the Additional Office space from December 2016 through April 2018 was in the amount of $650.00.  *Id.*  Fifteen out of the seventeen Sweetfin Checks that were sent to the Landlord were in the amounts of either $631 or $650.  *See* TMC's Exhibit K (Sweetfin Holdings, LLC rent checks).

28.    Of the remaining two Sweetfin checks that were not in the amount of $631 or $650: (1) Check No. 1493 was "[r]eplaced by Check 11837" that was in Debtor's name, *see* Debtor's Exhibit 38 (Debtor's replacement check dated 12/1/16 for $22,466.00); and (2) Check No. 110070 in the amount of $1,383.06 is in the exact amount invoiced by the Landlord in invoice numbers 2018-02 (C), 2018-02 (D), 2018-03 for the "Base Rent Charge (Additional space)," "Rent Late Fees (Additional space)," and "Base Rent Interest (Additional space)" for the Additional Office space.  Debtor's Exhibit 36 (the $1,383.06 aggregate amount).

29.    At one point, one of the rent checks of Debtor to TMC was cashed by an individual or entity other than TMC.  As a result, Mr. Nathan worked with Ms. McDonald of

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

IAC to submit a notarized Affidavit of Forged or Missing Endorsement Client Declaration

to Union Bank, N.A.  Nathan Declaration, ¶ 51; Debtor's Exhibit 40 (Mr. Nathan's Affidavit

of Forged or Missing Endorsement Client Declaration submitted to Union Bank); Debtor's

Exhibit 41 (email dated 11/3/16 from Ms. McDonald regarding the notarized declaration).

In an email with the subject "RE: notarized declaration by 8800 LLC" dated November 3,

2016, Ms. McDonald informed Union Bank and Mr. Nathan (among other parties) that she

was "working on [her notarized declaration regarding 8800 LLC's check]" and asked

where it should be sent.  Nathan Declaration, ¶ 51; Debtor's Exhibit 41 (email dated

11/3/16 from Ms. McDonald regarding the notarized declaration).

**iii.**    **Mail Addressed to Debtor and Received By TMC**

30.    Mail addressed to Debtor was generally sent to the Premises.  Nathan

Declaration, ¶ 53.  On several instances where Debtor's mail was incorrectly delivered to

Landlord TMC, such mail was subsequently forwarded by TMC to Mr. Nathan on behalf of

Debtor.  *Id.*

31.    In an email from Mr. Trent with the subject line "Estrella mail" dated

February 29, 2016, he informed "Mailroom8800" that "incoming mail that is addressed to

8800 LLC is for Estrella.  That is their business name for tax purposes.  I've been re-

delivering it to them for a few months now but you should cut me out of the loop going

forward.  It's usually tax or utilities related mail."  Nathan Declaration, ¶ 54; Debtor's

Exhibit 42 (email dated 2/29/16 from Mr. Trent regarding incoming mail addressed to 8800

LLC).

32.    In a subsequent email from Mr. Trent to other employees of the Landlord

dated April 7, 2016, Mr. Trent stated "REMEMBER – any incoming mail addressed to

'8800 LLC' belongs to Estrella – that's their legal tax ID name . . . be careful not to process

and pay for invoices related to 8800 LLC . . . I see that can be tricky and easily look like a

bill for us."  Nathan Declaration, ¶ 55; Debtor's Exhibit 43 (email dated 4/7/16 from Mr.

Trent regarding incoming mail).

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

33.     Further, in an email from Ms. McDonald for Landlord with the subject "RE: check" dated June 16, 2016, she told Mr. Nathan that she "received a check that [she thought] actually might be for [Mr. Nathan] . . . . It's made out to 8800 LLC which Shane [Trent] had noted was Estrella." Nathan Declaration, ¶ 56; Debtor's Exhibit 44 (emails dated 6/16/16 regarding the 8800 LLC check Ms. McDonald had received).  Mr. Nathan responded to Ms. McDonald's email and confirmed that Debtor's check was for him.  *Id.*

**C.     Debtor's Attempt to Assign the Lease**

34.     In late 2017, 1st Avenue Enterprises, LLC (the "Proposed Assignee") offered to purchase Debtor's business and take assignment of the Lease for, among other things, approximately $1,000,000.  Nathan Declaration, ¶¶ 66, 69.

35.     Debtor entered into a tentative purchase agreement with the Proposed Assignee (the "1st Avenue Agreement").  Nathan Declaration, ¶ 72; Debtor's Exhibit 55 (Debtor's tentative purchase agreement with the Proposed Assignee).  TMC's Exhibit GG (Business Purchase Agreement and Joint Escrow Instructions).

36.     Throughout this period, Debtor kept TMC apprised of the developments of the transaction with the Proposed Assignee.  Nathan Declaration, ¶ 73.

**D.     The Transfer Notice**

37.     On March 15, 2018, Mr. Fink, counsel for Debtor, sent an email (the "Transfer Notice") to Mr. Platt, counsel for TMC, requesting TMC's consent to an assignment of the Lease to the Proposed Assignee.  *Id.*, ¶ 74; Debtor's Exhibit 54C and TMC's Exhibit RRR (email dated 3/15/18 from Mr. Fink to Mr. Platt).

38.     The Transfer Notice attached a presentation regarding the Proposed Assignee and its proposed restaurant.  Debtor's Exhibits 54 and TMC's Exhibit RRR (presentation for the proposed restaurant on 8800 W. Sunset).

39.     The Transfer Notice revealed that the Proposed Assignee, 1st Avenue Enterprises, LLC, was composed of three partners: Joseph Miller, the Michelin rated executive chef; Joel Herzer, the restauranteur/operator; and Tom Buttgenbach, Ph.D., the financial partner.  Nathan Declaration, ¶ 70; Debtor's Exhibit 54A and TMC's Exhibit RRR

1  (description of the management team for the proposed restaurant).  It also revealed that

2  the financial backer, Mr. Buttgenbach, is a wealthy individual who made his fortune in

3  solar energy and other endeavors but who did not have prior experience in the restaurant

4  industry.  Debtor's Exhibit 54A and TMC's Exhibit RRR (description of the management

5  team for the proposed restaurant).  Mr. Buttgenbach's lack of experience in the restaurant

6  industry was subsequently confirmed by the Proposed Assignee's General Manager, Mr.

7  Herzer.  *See* TMC's Exhibit VVVV (email dated 4/18/18 from Mr. Herzer regarding the final

8  items he was requested to submit for the lease) ("Tom Buttgenbach does not have a

9  history of operating restaurants and as mentioned in our telephone conversation is our

10  financial backer.").  The Proposed Assignee purported to have a balance sheet asset

11  value of over $28 million.  Nathan Declaration, ¶ 70; Debtor's Exhibit 52 (the Proposed

12  Assignee's financial statements); Debtor's Exhibit 53 (the Proposed Assignee's Wells

13  Fargo bank statement).

14  **E.    TMC's Due Diligence**

15       40.    On March 20, 2018, at 12:33 p.m., Mr. Platt, counsel for TMC, sent an email

16  to Mr. Fink, counsel for Debtor, requesting additional information regarding the Proposed

17  Assignee and indicating that he had "heard back from [his] client and they are concerned

18  that the documentation that [Debtor] provided to the landlord was deficient."  Debtor's

19  Exhibit 57 and TMC's Exhibit CCCC (email dated 3/20/18 from Mr. Platt to Mr. Fink

20  requesting additional information).  In that same email, Mr. Platt also requested the

21  following additional items that, "at minimum," had to be submitted to the Landlord:

22          a.  All of the information/documentation required to be provided by the

23              tenant to the landlord by Section 13.2 of the lease;

24          b.  Documentation supporting the information contained on the Balance

25              Sheet and Profit & Loss Statement;

26          c.  Most recent bank statements that show the cash on hand, including

27              when the cash was deposited in the bank;

28

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

d. Residential address, social security number and date of birth of each of the investors;

e. Financial statements of each of the investors;

f. Description of the "Other Assets" on the Balance Sheet. Please explain the basis of the $28 million in assets in 1st Avenue Capital Holding, LLC;

g. What entity is actually acquiring the lease? Is it a single purpose entity? Does that entity have any assets? What are the assets? When and how did it acquire these assets?

h. There are dozens of entities somehow related to 1st Avenue Capital Holding, LLC. Is this the entity acquiring the lease? Does it have assets? Please describe the assets and provide bank statements for the entity that will be the signatory to the documents; We also need a full financial statement (balance sheet, income statement, cash flow statement) for the actual assignee.

i. Who are the owners of the entity that will be assigned the lease; We need financial information on the owners.

j. What is the source of the $4.25 million in income for 1st Avenue Capital Holding, LLC for the first 2 months of 2018; and

k. Who contributed the $21.5 million in capital to 1st Avenue Capital Holding, LLC.

l. The balance sheet for 1st Avenue Capital Holding, LLC lists "Accumulated Depreciation" of $671,068. What assets were the subject of that depreciation? Where are those assets on the balance sheet?

*Id.*

41.    The next day, on March 21, 2018, at 5:43 p.m., Mr. Fink, counsel for Debtor, responded by email, providing additional financial information of the Proposed Assignee and responses to the questions posed by Mr. Platt, counsel for TMC.  TMC's Exhibits V and DDDD (email chain dated from 3/20/18 to 3/21/18 between Mr. Fink and Mr. Platt).

-23-

Those responses were provided by Liz Roz, the Controller for the Proposed Assignee. *Id.* In that email, Mr. Fink suggested "a call between the business people as soon as possible to hash out any questions." *Id.*

42.    On March 22, 2018, at 4:07 p.m., Mr. Platt responded for Landlord TMC, stating that such a telephonic meeting could be scheduled once TMC had received the additional documents and other information that TMC had requested.  Debtor's Exhibit 58 and TMC's Exhibit CC (email chain dated 3/22/18 between Mr. Platt and Mr. Fink).

43.    On March 22, 2018, at 4:11 p.m., Mr. Fink, Debtor's counsel, stated in an email to Mr. Platt, Landlord TMC's counsel, "[i]f there is anything you need - I am sure [the Proposed Assignee] will provide - but I think you have everything at this point."  TMC's Exhibit CC (email chain dated 3/22/18 between Mr. Platt and Mr. Fink).  Both Debtor and the Proposed Assignee in their communications with TMC expressed a sense of urgency to TMC to review the transfer request in their efforts to close their transaction.  Debtor's Exhibit 58 (email dated 3/22/18 from Mr. Fink, counsel for Debtor, to Mr. Platt, counsel for TMC) ("Any chance at getting a call with the new potential operator and the business people?  They are chomping at the bit to talk to someone at the Landlord.").

44.    On March 23, 2018, at 8:23 a.m., Mr. Fink, Debtor's counsel, sent an email to Mr. Platt, Landlord TMC's counsel, providing a draft of the proposed Lease Assignment and reiterating that the Proposed Assignee would like to speak with TMC.  Debtor's Exhibit 59 and TMC's Exhibit OOOO (email dated 3/23/18 from Mr. Fink to Mr. Platt regarding the lease assignment draft).

45.    On March 23, 2018, at 10:49 a.m., in another email from Mr. Platt, Landlord TMC's counsel, to Mr. Fink, Debtor's counsel, Mr. Platt reiterated that "the proposed assignee did not provide [his] client with everything required to be provided under Section 13.2 of the lease" but nevertheless requested a date and time when the Proposed Assignee would be available to speak with TMC.  Nathan Declaration, ¶ 79; Debtor's Exhibit 59 and TMC's Exhibit FFFF (email dated 3/23/18 from Mr. Platt to Mr. Fink asking about the Proposed Assignee's availability for a call).

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

46.     On March 26 and 27, 2018, there was an exchange of email correspondence between Ben Gildin (IAC's in-house counsel), Mr. Fink (Debtor's prepetition counsel), and representatives of the Proposed Assignee to schedule a conference call.  TMC's Exhibit Y (email chain dated 3/26/18-3/27/18).  A date and time were initially established.  *Id.*  Mr. Herzer for the Proposed Assignee emailed Mr. Gildin for IAC on March 26, 2018 and asked that the call be moved up to enable Mr. Buttgenbach, one of the principals of the Proposed Assignee, to participate in the call.  *Id.*  The call was rescheduled to accommodate Mr. Buttgenbach.  *Id.*

47.     The conference call proceeded as planned on March 28, 2018. Stewart Declaration, ¶ 55.  Notwithstanding the fact that the conference call was specifically rescheduled to accommodate Mr. Buttgenbach's schedule, Mr. Buttgenbach failed to participate.  *Id.*

48.     TMC subsequently followed up with an email to the Proposed Assignee in an effort to reschedule a telephone conference with Mr. Buttgenbach.  *Id.*; Debtor's Exhibit 61 and TMC's Exhibit Z (email dated 4/3/18 from Mr. Gildin).  Notwithstanding TMC's efforts, Mr. Buttgenbach never responded, and he ultimately never spoke to anyone from TMC.  Stewart Declaration, ¶¶ 56, 61.

49.     On March 29, 2018, at 1:17 p.m., Mr. Herzer for the Proposed Assignee sent Mr. Gildin, IAC's counsel, for Landlord, a list of several proposed changes to the Lease that the Proposed Assignee sought, apparently as a condition to accepting assignment of the Lease.  TMC's Exhibit EE (email dated 3/29/18 regarding "8800 Sunset Lease").  The joint escrow instructions gave the Proposed Assignee the right to terminate the assignment in the event that TMC failed to agree to the Proposed Assignee's requested changes.  TMC's Exhibit GG, Addendum ¶ 12 (business purchase agreement and joint escrow instruction).  The Escrow Instructions also gave the Proposed Assignee the right

///

///

///

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

1  to cancel the assignment if TMC refused to waive its right to receive the Transfer Profits it

2  was entitled to pursuant to Section 13.5 of the Lease.  *Id.*[2]

3       50.    On March 30, 2018 at 3:27 p.m., in response to Mr. Nathan's inquiry about

4  outstanding documents from the Proposed Assignee regarding the proposed assignment,

5  Mr. Gildin, IAC's counsel, on behalf of Landlord. told Mr. Nathan, Debtor's principal, that

6  "[t]hey have not yet provided everything we requested."  Debtor's Exhibit 60 and TMC's

7  Exhibit LLLL (email dated 3/30/18 from Mr. Gildin to Mr. Nathan).

8       51.    Landlord TMC continued to obtain further documents and information from

9  the Proposed Assignee; Mr. Gildin, IAC's counsel, on behalf of Landlord, corresponded

10  with Mr. Herzer from the Proposed Assignee to obtain the required information.  Debtor's

11  Exhibit 64; TMC's Exhibit DD.

12  **F.**    **TMC Deems Transfer Notice Submitted**

13       52.    On April 3, 2018, at 5:31 p.m., Mr. Gildin of IAC on behalf of Landlord sent

14  an email to Mr. Herzer for the Proposed Assignee, Mr. Fink, Debtor's counsel, Mr. Nathan,

15  Debtor's principal, and others, in which he stated: "Although we have not received

16  everything technically required under Section 13.2 of the lease, we nevertheless will

17  consider the Transfer Notice to be fully and formally submitted as of today."  Debtor's

18  Exhibit 61 and TMC's Exhibit Z (email dated 4/3/18 from Mr. Gildin considering the

19  Transfer Notice to be fully and formally submitted).  Mr. Gildin went on to note that the

20  clock on the 20-day deadline by which TMC had to make its decision regarding the

21  transfer request would begin that day.  *Id.* ("Pursuant to Section 13.2 of the lease we will

22  provide a response within 20 business days (i.e., by end of day on May 1, 2018).").

23

24

---

25  [2] Section 13.5 of the Lease provides that Landlord TMC is entitled to 50% of the "Transfer Profits" (including all rent and other consideration) paid from the Proposed Assignee to Debtor.  Mr. Nathan testified that the Proposed Assignee offered to purchase Debtor's business for approximately $1,000,000.  Nathan

26  Declaration, ¶ 69.  The Business Purchase Agreement and Joint Escrow Instructions show a purchase price of $900,000.  *See* TMC's Exhibit GG.  Accordingly, it appears the Proposed Assignee was requesting that

27  TMC forego its right to approximately $450,000 in Transfer Profits.  *See* Proposed Assignment Agreement, TMC's Exhibit OOOO, ¶ 4 ("Landlord acknowledges and agrees that it waives any 'Transfer Profits' from Assignor with respect to this Assignment.").

28

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

53.    In emails to Mr. Gilden (IAC's in-house counsel) as Landlord's agent, both Mr. Nathan (Debtor's principal) and Mr. Herzer (as the agent of the Proposed Assignee) thanked Mr. Gildin for his email on behalf of Landlord deeming the Transfer Notice submitted.  TMC's Exhibit PPPP (email dated 4/4/18 from Mr. Nathan thanking Mr. Gildin); Debtor's Exhibit 62 and TMC's Exhibit Z (email dated 4/3/18 from Mr. Herzer thanking Mr. Gildin).  Mr. Nathan stated, "Thanks for the update.  What do you still need from the buyers according to 13.2?  I will make sure they provide."  TMC's Exhibit PPPP (email dated 4/4/18).  Mr. Herzer stated, "Thank you Ben.  Can you please let us know what else you need as far as financials.  We can move this forward quickly."  Debtor's Exhibit 62 and TMC's Exhibit Z (email dated 4/3/18).  At no point did Mr. Nathan, Debtor's principal, Debtor's counsel, or the Proposed Assignee object to Landlord's determination that the Debtor's Transfer Request was fully and formally submitted and the deadline by which Landlord had to determine whether to accept the assignment request, reject the assignment request, or exercise one of its other options under Section 13.3 of the Lease was set.  *See* TMC's Exhibit PPPP (email dated 4/4/18 from Mr. Nathan); Debtor's Exhibit 62 and TMC's Exhibit Z (email dated 4/3/18 from Mr. Herzer).  On the contrary, the statements by Mr. Nathan on behalf of Debtor and Mr. Herzer on behalf of the Proposed Assignee indicate that they wanted to facilitate an expeditious decision by Landlord TMC so they could proceed with their proposed purchase agreement.

**G.    Landlord TMC Obtains All the Required Documents**

54.    Even though Landlord TMC considered the Transfer Notice to be fully and formally submitted and no further documentation was required, TMC indicated that it was willing to consider additional information provided by the Proposed Assignee.  Debtor's Exhibit 61 and TMC's Exhibit Z (email dated 4/3/18 from Mr. Gildin).  In his April 3, 2018, 5:31 p.m. email, Mr. Gildin on behalf of Landlord invited the Proposed Assignee to "feel free to pass along any additional information [they would] like [TMC] to consider."  *Id.*  Mr. Herzer (the General Manager of the Proposed Assignee) sent an email to Mr. Gildin asking him "what else [he] need[ed] as far as financials." on April 3, 2018 at 6:02 p.m.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

1  Debtor's Exhibit 62 and TMC's Exhibit Z (email dated 4/3/18 from Mr. Herzer asking Mr.

2  Gildin what additional information he needs to provide).

3      55.    Following Mr. Gildin's email of April 3, 2018, the Proposed Assignee elected

4  to accept Mr. Gildin's offer to submit additional due diligence materials to TMC.  Debtor's

5  Exhibit 63 and TMC's Exhibits QQQQ, RRRR (email dated 4/5/18 from Mr. Herzer asking

6  Mr. Gildin for clarification so that "[he] could get those answers to [Mr. Gildin] quickly.").

7  There followed a number of additional emails between TMC and Proposed Assignee

8  aimed at providing this additional information.  TMC's Exhibit SSS (email dated 4/11/18

9  with the following attachments: Certificate of Registration from the State of California

10  stating that the Proposed Assignee could transact intrastate business, Application to

11  Register a Foreign LLC, Operating Agreement of the Proposed Assignee, Certificate of

12  Formation from the City of Delaware for LLC, bank statement from Wells Fargo, LLC

13  Agreement of the Proposed Assignee, and Articles of Organization for LLC in the State of

14  California); TMC's Exhibit TTT (Mr. Buttgenbach's balance sheet, DE Certificate of Good

15  Standing, and driver's license); TMC's Exhibit TTTT (email dated 4/15/18 from Mr. Herzer

16  with part of what Mr. Gildin asked for); TMC's Exhibit UUUU (email dated 4/16/18 with

17  CAR Business Purchase Agreement attached); TMC's Exhibit VVVV (email dated 4/18/18

18  with subject "Final items asked for 8800 Sunset"); TMC's Exhibit YYYY (email dated

19  4/18/18 with copy of Mr. Miller's driver's license attached).

20      56.    On April 5, 2018, at 1:15 p.m., Mr. Herzer for the Proposed Assignee sent

21  another email to Mr. Gildin on behalf of Landlord asking him to "let [the Proposed

22  Assignee] know what points regarding the financials [Mr. Gildin] need addressed [so the

23  Proposed Assignee] can get those answers to [Mr. Gildin] quickly."  Debtor's Exhibit 63

24  and TMC's Exhibit QQQQ.  In a response sent from Mr. Gildin to Mr. Herzer on April 5,

25  2018, at 12:02 p.m., he indicated, "Yes, we can put that together for you."  *Id.*

26      57.    On April 11, 2018, at 8:24 p.m., Mr. Gildin, IAC in-house counsel, on behalf

27  of Landlord, sent an email to both Mr. Nathan of Debtor and Mr. Herzer of the Proposed

28  Assignee, requesting the following additional and/or outstanding items:

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

a. A certified certificate of organization of the proposed assignee entity and the parent/guarantor entity

b. The operating agreement for the proposed assignee entity

c. A certificate of good standing in the state of California for the proposed assignee entity and the parent/guarantor entity

d. A summary of Thomas Buttgenbach's history operating restaurants

e. A copy of the Business Purchase Agreement referenced in Section 1 of the draft assignment

f. Evidence that the proposed Assignee has reviewed and agreed to sign the draft assignment

g. The material terms of the transfer of the liquor license

h. A copy of the driver's license/id of each of Thomas Buttgenbach/Joel Herzer/Joseph Miller in order to run background checks

i. A credit report for Thomas Buttgenbach

j. Certified copies of the bank statement/balance sheets provided (each updated as of April 1, 2018)

k. An operating budget

Debtor's Exhibit 64 and TMC's Exhibit DD (email dated 4/11/18 from Mr. Gildin with a list of outstanding items).  Mr. Gildin's requests for additional and/or outstanding items came after he purportedly considered the "Transfer Notice to be fully and formally submitted" on April 3, 2018.  Debtor's Exhibit 61 and TMC's Exhibit Z (email dated 4/3/18 from Mr. Gildin considering the Transfer Notice to be fully and formally submitted).

58.    Ultimately, Landlord TMC acquired all the information and documents required by the Lease to satisfy the Transfer Notice.  *See* Stewart Declaration, ¶ 62; TMC's Exhibit S (Chart of Due Diligence Documents Received).  Debtor's counsel, Mr. Fink, also confirmed that Landlord TMC received all the information, stating, "If there is anything you need – I am sure they will provide – *but I think you have everything at this*

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

1  *point*." TMC's Exhibit CC (email dated 3/22/18 regarding remaining information to be

2  submitted) (emphasis added).

3       59.     Specifically, the following information received by Landlord TMC

4  corresponds to the information required under Section 13.2 of the Lease:

| § 13.2 | Information Requested | Information Received |
|--------|----------------------|----------------------|
| i(a) | The name and address of the proposed Transferee. | - Identity of principals included in 8800 W. Sunset Overview and Estrella Business Plan 2018 PowerPoint [TMC's Exhibit RRR]<br>- Told name of Transferee is First Avenue Enterprises LLC [TMC's Exhibit DDDD]<br>- Address of First Avenue Enterprises LLC provided in Articles of Incorporation [TMC's Exhibit SSS] |
| i(b) | Current financial statements of the proposed Transferee certified by an officer, partner, manager or owner thereof, and any other information and materials (including, without limitation, credit reports, business plans, operating history, bank and character references) required by Landlord to assist Landlord in reviewing the financial responsibility, character, and reputation of the proposed Transferee. | - First Avenue Capital Holdings, LLC Balance Sheet [TMC's Exhibit RRR]<br>- First Avenue Capital Holdings, LLC Profit & loss Statement [TMC's Exhibit RRR]<br>- First Avenue Capital Holdings, LLC Wells Fargo Analyzed Business Checking Statement [TMC's Exhibit DDDD]<br>- 1st Avenue Enterprises, LLC WellsOne Account Statement as of March 1, 2018 [TMC's Exhibit SSS]<br>- First Avenue Capital Holdings, LLC Income and Assets [TMC's Exhibit DDDD]<br>- First Avenue Enterprises, LLC "does not yet hold any assets" [TMC's Exhibit DDDD]<br>- Buttgenbach Balance Sheet [TMC's Exhibit ZZZ]<br>- Buttgenbach Personal Companies Org Chart [TMC's Exhibit AAAA] |
| i(c) | The nature of such Transferee's business, restaurant plan and proposed use of the Premises. | - 8800 W. Sunset Overview [TMC's Exhibit RRR]<br>- Estrella Business Plan 2018 PowerPoint [TMC's Exhibit RRR]<br>- Estella Project 2018 Menu [TMC's Exhibit RRR]<br>- Tentative Plans for Estrella Remodel [TMC's Exhibit IIII]<br>- 8800 Sunset Reopening Costs [TMC's Exhibit TTTT]<br>- Forecast Statement of Operations [TMC's Exhibit TTTT] |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

| § 13.2 | Information Requested | Information Received |
|---|---|---|
| i(d) | The proposed effective date of the proposed Transfer. | - Business Purchase Agreement/ Escrow Documents [TMC's Exhibit UUUU] |
| i(e) | All of the principal terms of the proposed Transfer (including a calculation of the Transfer Profits (defined in Section 13.5, below)). | - Business Purchase Agreement/ Escrow documents [TMC's Exhibit UUUU]<br>- Assignment and Assumption and Consent to Assignment and Assumption of Lease [TMC's Exhibit OOOO] |
| i(f) | Description of such Transferee's track record and experience in operating restaurants of comparable scope and quality. | - 8800 W. Sunset Overview [TMC's Exhibit RRR]<br>- Estrella Business Plan 2018 PowerPoint [TMC's Exhibit RRR]<br>- Buttgenbach has no "history of operating restaurants" [TMC's Exhibit VVVV] |
| i(g) | Such other information and materials as Landlord may in good faith request (provided, that if Landlord requests such additional information or materials, the Transfer Notice shall not be deemed to have been received until Landlord received such additional materials). | - Delaware Certificate of Good Standing (1st Avenue Capital Holding, LLC) [TMC's Exhibit TTT]<br>- State of California Certificate of Registration (1st Avenue Capital Holding, LLC) [TMC's Exhibit SSS]<br>- Application to Register a Foreign Limited Liability Company (1st Avenue Capital Holding, LLC) [TMC's Exhibit SSS]<br>- Operating Agreement of 1st Avenue Enterprises, LLC Capital Contributions by Member (1st Avenue Enterprises, LLC) [TMC's Exhibit SSS]<br>- Delaware Certificate of Formation (1st Avenue Capital Holding, LLC) [TMC's Exhibit SSS]<br>- Limited Liability Company Agreement of 1st Avenue Capital Holding, LLC [TMC's Exhibit SSS]<br>- Capital Contributions by Member (1st Avenue Capital Holding, LLC) [TMC's Exhibit SSS]<br>- Form of Certificate – Membership Interest Certificate (1st Avenue Capital Holding, LLC) [TMC's Exhibit SSS]<br>- California Secretary of State Doing Business Registration Confirmation [TMC's Exhibit SSS]<br>- California Secretary of State Articles of Organization (1st Avenue Enterprises, LLC) [TMC's Exhibit SSS]<br>- Buttgenbach, Herzer and Miller driver's licenses [TMC's Exhibits TTT, VVVV, YYYY] |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

| § 13.2 | Information Requested | Information Received |
|---|---|---|
| ii | Proposed assignment and a consent to sublease form. | - Assignment and Assumption and Consent to Assignment and Assumption of Lease [TMC's Exhibit OOOO |

*See* Stewart Declaration, ¶ 62; TMC's Exhibit S (Chart of Due Diligence Documents Received).

60.   As for Debtor's specific contentions that certain information was not received, *see* Debtor's Proposed Findings of Fact and Conclusions of Law, ECF 113, ¶ 90, the court finds that TMC received the information it needed as described below:

| Allegedly Missing Information and Debtor's Argument for Inadequacy | Court's Finding |
|---|---|
| - "[C]urrent financial statements of the proposed Transferee certified by an officer, partner, manager or owner therof . . ." [Lease § 13.2(b)]<br>- Full financial statement (balance sheet, income statement, cash flow statement) for the actual assignee [Requested by TMC's counsel Mr. Platt via email on March 20, 2018. *See* Debtor's Exhibit 57, request #8]<br>- Certified copies of the bank statement/ balance sheets provided (updated as of 4/1/18) [Requested by IAC's in-house counsel Mr. Gildin via email on April 11, 2018. *See* Debtor's Exhibit 64, request #10]<br><br>Debtor Argues:  The Proposed Assignee's financial statements were not provided.  Only uncertified copies of the balance sheet and profit and loss statements of 1st Avenue Capital Holding, LLC were provided. | <u>TMC received all the information it needed because it was told the Proposed Assignee was a shell entity formed to purchase the Restaurant and the rights to the Lease.</u>  *See* TMC's Exhibit Z (Email dated 3/21/18 from Debtor's counsel (Mr. Fink) to TMC's counsel (Mr. Platt) stating, in response to questions 6 and 7: "1st Avenue Enterprises is the entity formed for the restaurant(s). . . .  1st Avenue Enterprises will acquire the lease.  It is 100% owned by 1st Avenue Capital Holding.  It does not yet hold any assets.").  <u>Moreover, TMC received the following information:</u><br>- First Avenue Capital Holdings, LLC Balance Sheet [TMC's Exhibit RRR]<br>- First Avenue Capital Holdings, LLC Profit & loss Statement [TMC's Exhibit RRR]<br>- First Avenue Capital Holdings, LLC Wells Fargo Analyzed Business Checking Statement [TMC's Exhibit DDDD]<br>- 1st Avenue Enterprises, LLC WellsOne Account Statement as of March 1, 2018 [TMC's Exhibit SSS] |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

| Allegedly Missing Information and Debtor's Argument for Inadequacy | Court's Finding |
|---|---|
| - Documentation supporting the information contained on the Balance Sheet and Profit & Loss Statement [Requested by TMC's counsel Mr. Platt via email on March 20, 2018. *See* Debtor's Exhibit 57, request #2]<br><br><u>Debtor Argues</u>:  None or insufficiently provided. | - First Avenue Capital Holdings, LLC Income and Assets [TMC's Exhibit DDDD]<br>- First Avenue Enterprises, LLC "does not yet hold any assets" [TMC's Exhibit DDDD]<br>- Buttgenbach Balance Sheet [TMC's Exhibit ZZZ]<br>- Buttgenbach Personal Companies Org Chart [TMC's Exhibit AAAA] |
| - Calculation of the Transfer Profits [Lease § 13.2(e)]<br><br><u>Debtor Argues</u>:  None provided. | <u>The calculation is $0.  The Transfer Profits under the proposed assignment would have been $0 because the Proposed Assignee required that TMC waive its right to collect transfer profits on the transaction.</u>  *See* Proposed Assignment Agreement, TMC's Exhibit OOOO, ¶ 4 ("Landlord acknowledges and agrees that it waives any 'Transfer Profits' from Assignor with respect to this Assignment.") |
| - Credit Reports [Lease § 13.2(b)]<br>- Bank and Character References [Lease § 13.2(b)]<br>- Residential address, social security number and date of birth of each of the investors [Requested by TMC's counsel Mr. Platt via email on March 20, 2018. *See* Debtor's Exhibit 57, request #4]<br>- A credit report for Thomas Buttgenbach [Requested by IAC's in-house counsel Mr. Gildin via email on April 11, 2018. *See* Debtor's Exhibit 64, request #9]<br><br><u>Debtor Argues</u>:  None provided. | <u>TMC received all the information it needed about the financial condition of the Proposed Assignee and its members, including Tom Buttgenbach, the "financial backer."</u>  In an email forwarded to TMC from Mr. Fink (Debtor's counsel), Mr. Herzer (the general manager for the Proposed Assignee) wrote "We can provide more information directly with landlord as noted.  Please get this meeting set up with landlords.  *Our [the Proposed Assignee's] financial viability is beyond question*."  *See* Email dated March 21, 2018, at 1:04 p.m., TMC's Exhibit DDDD (emphasis added).  Later, Mr. Herzer wrote to Mr. Gildin, IAC's in-house counsel, "Tom Buttgenbach . . . is our financial backer.  He has built his solar company from a start up to an organization that provides 10% of the power to the Los Angeles area.  He has |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

| Allegedly Missing Information and Debtor's Argument for Inadequacy | Court's Finding |
|---|---|
| - Financial statements of each of the investors [Requested by TMC's counsel Mr. Platt via email on March 20, 2018. *See* Debtor's Exhibit 57, request #5]<br>- Financial information of the owners of the entity that will be assigned the Lease [Requested by TMC's counsel Mr. Platt via email on March 20, 2018 *See* Debtor's Exhibit 57, request #9]<br><br><u>Debtor Argues</u>:  Information requested for Mr. Joel Herzer and Joseph Miller (*i.e.*, the other partners) were not provided. | brokered deals resulting in over 5 billion dollars in revenue . . . .  *We won't be providing a credit report regarding his worthiness*."  *See* Email dated April 18, 2018, at 9:36 a.m., TMC's Exhibit VVVV (emphasis added). |
| - Certificate of good standing in California for the Potential Assignee and parent/guarantor entity [Requested by IAC's in-house counsel Mr. Gildin via email on April 11, 2018. *See* Debtor's Exhibit 64, request #3]<br><br><u>Debtor Argues</u>:  The California certificates of good standing were not in the trial exhibits admitted into evidence. | |
| - Material terms of the transfer of the liquor license [Requested by IAC's in-house counsel Mr. Gildin via email on April 11, 2018. *See* Debtor's Exhibit 64, request #7]<br><br><u>Debtor Argues</u>: None provided. | <u>All material terms were included in the submitted information.  According to the Business Purchase Agreement, the proposed sale of Debtor's business to the Proposed Assignee included the Liquor License, which the parties valued at $85,000.</u>  *See* Business Purchase Agreement and Joint Escrow Instructions, TMC's Exhibit GG at 3, § 6 ("Assets Transferred" includes "transferable government licenses and permits"); at 4, § 14(A) (requiring Debtor's compliance with Alcohol Beverage Control Act); at Addendum, § 1(E) (if government does not approve transfer before sale closes, purchase price is reduced $85,000); at Addendum, § 6(a) ("Assets Transferred . . . shall include . . . [i]n addition to the Liquor License, all other transferable permits and licenses."). |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**H.      Landlord TMC's Decision to Terminate the Lease and Invoke Recapture Provision of the Lease**

61.     In the second half of 2017, Landlord TMC began to consider plans to renovate and develop for its own use the portion of the ground floor of the Building that was not part of the restaurant premises.  Stewart Declaration, ¶ 63.  Once it became evident that the restaurant was experiencing financial difficulties, TMC also began to consider ways to expand its development of the ground floor into the Premises and associated theater space in the event that the Debtor went out of business.  *Id.*

62.     After Landlord TMC received the Transfer Notice on March 15, 2018, TMC personnel began in earnest to create a proposal to renovate the entire ground floor, for TMC to consider as a possible alternative to permitting a new tenant to take over the Lease.  *Id.*, ¶ 64.  A final plan was proposed to IAC.  *Id.*  The plan was designed to serve as both a revenue generating event space and a much-needed common area for employees of IAC and its subsidiary businesses who occupy the floors above the restaurant in the Building.  *Id.*

63.     IAC's management as TMC's parent then considered whether to grant the Debtor's assignment request or to recapture the space for its own use, and they identified numerous reasons not to assign or sublease the Lease and instead exercise the Recapture Right: (1) the Proposed Assignee required material modifications in the Lease that impaired TMC's substantive rights under the Lease; (2) the Tenant required TMC to forfeit the Transfer Profits it was entitled to under the Lease, *see supra*, fn. 2; (3) Mr. Buttgenbach refused to speak with TMC, *see* Findings of Fact, ¶¶ 47-48, *supra*; (4) the Proposed Assignee was a shell entity, without assets, a balance sheet, financial statements, employees, or a bank account; (5) Mr. Buttgenbach had no prior experience in the restaurant business; and (6) TMC believed that the Proposed Assignee was unlikely to succeed as the majority of the changes to the business plan that the Proposed Assignee suggested had already been tried unsuccessfully by the Tenant.  Stewart Declaration, ¶¶ 65 and 67.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

64.    Ultimately, Landlord TMC determined not to approve Debtor's Transfer Notice and instead elected to exercise the Recapture Right "in the exercise of its sole and absolute discretion."  Lease, § 13.3; Stewart Declaration, ¶ 67.

65.    On April 18, 2018, Landlord TMC gave written notice of its decision to terminate the Lease and recapture the Premises effective May 1, 2018, in accordance with the notice provision in the Lease (the "Recapture Letter").  Debtor's Exhibit 66 and TMC's Exhibit AA (the Recapture Letter).

66.    Two days later, on April 20, 2018, Mr. Fink, counsel for Debtor, sent a reply letter to Mr. Platt, counsel for TMC, threatening to file for bankruptcy protection if TMC did not reconsider exercising the Recapture Right, saying, "As any bankruptcy attorney will tell you, the Bankruptcy Court can strike contract provisions that are so restrictive that they constitute a de facto anti-assignment provision," and that "[w]hile the Lease requires the Landlord to be reasonable with respect to a proposed assignment, the recapture provision is in the Landlord's sole and absolute discretion."  Debtor's Exhibit 69 and TMC's Exhibit YYY (letter from Mr. Fink to Mr. Platt regarding TMC's exercise of the Recapture Right).

67.    On April 25, 2018, Mr. Platt, Landlord TMC's counsel, sent a letter to Mr. Fink, Debtor's counsel, stating that the Landlord would terminate the Lease pursuant to the Recapture Provision effective immediately, instead of on May 1, 2018 as previously stated (the "Second Recapture Letter").  Debtor's Exhibit 70 and TMC's Exhibit WWWW (the Second Recapture Letter).

68.    Since May 1, 2018, Debtor has been tendering checks to Landlord TMC for the monthly rent, in the approximate amount of $27,000 each month.  Trial Transcript 167:10-19 ("Q. . . . Since May 1st of 2018 the debtor has been tendering checks to the landlord for rent each month, is that true?.  A.  That's correct.").  TMC has not cashed any of those checks.  Trial Transcript 167:15-17 ("Q.  And the landlord hasn't cashed them, is that true?  A.  That's correct.").

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## II.    **CONCLUSIONS OF LAW**

**A.    Jurisdiction**

1.    This court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334(b).  Venue is proper pursuant to 28 U.S.C. § 1408.  This is a contested matter within the meaning of Federal Rule of Bankruptcy Procedure 9014.  This contested matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(O).

**B.    Standard for Lease Assumption Under 11 U.S.C. § 365**

2.    A chapter 11 debtor in possession may "assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. §§ 365(a), 1107(a); *see also, In re Waterkist Corp.*, 775 F.2d 1089, 1091 (9th Cir. 1985).

3.    A debtor in possession may not assume a lease under which it is in default unless, at the time of the assumption, the debtor (A) cures, or provides adequate assurance that it will promptly cure, such default; (B) compensates, or provides adequate assurance that it will promptly compensate, a party other than the debtor to such lease, for any actual pecuniary loss to such party resulting from such default; and (C) provides adequate assurance of future performance under such lease.  11 U.S.C. § 365(b)(1); *see also, In re Windmill Farms, Inc.*, 841 F.2d 1467, 1473 (9th Cir. 1988) (all three requirements must be met).

4.    Moreover, a debtor "may not assume or assign any executory contract or unexpired lease of the debtor . . . if . . . such lease is of nonresidential real property and has been terminated under applicable nonbankruptcy law prior to the order for relief."  11 U.S.C. § 365(c)(3).  "Applicable nonbankruptcy law" means applicable state law.  *In re Windmill Farms, Inc.*, 841 F.2d at 1469 (citing *In re Waterkist Corp.*, 775 F.2d at 1091).  "Simply put, if a lease of nonresidential real property has been terminated under state law before the filing of a bankruptcy petition, there is nothing left for the trustee to assume."  *Id.* (citing *Kearny Mesa Crossroads v. Acorn Investments (In re Acorn Investments)*, 8 B.R. 506, 510 (Bankr. S.D. Cal.1981)).

-37-

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

5.      Even though a lease may have been terminated before the filing of a bankruptcy petition, a debtor in possession may be entitled to be relieved from forfeiture of the lease under California law, in which case assumption of the lease would be proper.  *In re Windmill Farms, Inc.*, 841 F.2d at 1471-1472 (citing *In re Waterkist Corp.*, 775 F.2d at 1091).  When a motion to assume a lease pertains to an allegedly terminated lease, the court must apply a two-part test:

> The first part of the test is to determine whether the lease terminated before the petition in bankruptcy was filed. . . .  The second part of the test requires the court to 'determine *whether the termination could have been reversed under a state anti-forfeiture provision or other applicable state law*.' . . .  This second step in the analysis 'permits the debtor-in-possession the same opportunities to avoid forfeiture of a lease . . . that it would have received under state law absent the bankruptcy proceedings.'

*In re Windmill Farms, Inc.*, 841 F.2d at 1472 (quoting *In re Waterkist Corp.*, 775 F.2d at 1091) (emphasis in *Windmill*) (internal citations omitted).

6.      Because Debtor brings this Motion to assume the Lease pursuant to 11 U.S.C. § 365, Debtor has the burden of proving "that the lease is one subject to assumption and that all requirements for assumption have been met."  *In re Rachels Industries, Inc.*, 109 B.R. 797, 802 (Bankr. W.D. Tenn. 1990).

7.      TMC contends that the Lease was terminated under California law before the Petition Date because TMC properly exercised the Recapture Right.  Debtor argues that (i) TMC did not properly exercise the Recapture Right because it had not received all the required information enumerated in Section 13.2 of the Lease, and (ii) even if TMC had properly exercised the Recapture Right, Debtor is entitled to relief from forfeiture under California law.  For the reasons discussed below, the court finds that (i) the Lease was terminated under California law before the Petition Date because TMC properly exercised the Recapture Right after receiving all the required information enumerated in Section 13.2 of the Lease, and (ii) Debtor cannot use any of California's relief from forfeiture statutes to modify the Lease.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

i. **<u>The Lease Was Terminated Before the Petition Date.</u>**

8.    Recapture provisions are valid and enforceable under California law.  *Carma Developers (California), Inc. v. Marathon Development California, Inc.*, 2 Cal.4th 342, 353-354 (1992).

9.    Under California law, "[i]t is the public policy of the state and fundamental to the commerce and economic development of the state to enable and facilitate freedom of contract by the parties to commercial real property leases."  California Civil Code § 1995.270.  The parties to a commercial lease are therefore free to allocate the future economic benefits of the lease to the landlord or to the tenant.  *Carma Developers (California), Inc. v. Marathon Development California, Inc.*, 2 Cal. 4th at 362.

10.    TMC argues that under *Carma Developers (California), Inc. v. Marathon Development California, Inc.*, its termination right pursuant to the Recapture Provision is not subject to a reasonableness requirement.  In *Carma*, the California Supreme Court reversed a judgment of the trial court and Court of Appeal and held that a landlord's exercise of its recapture right in response to an assignment request from the tenant was not an unreasonable restraint on alienation.  *Id.* at 376.  The lease in *Carma* contained both a recapture provision and a prohibition on the landlord unreasonably withholding consent to an assignment of the lease.  *Id.* at 351-352.  The court found that the latter did not impose a reasonableness requirement on the landlord's recapture rights.  *Id.* at 364-366.  However, although the California Supreme Court so held, it further explained that the implied covenant of good faith and fair dealing applied to the recapture provision because the covenant applies to all contracts:

> Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement. . . .  This duty has been recognized in the majority of American jurisdictions, the Restatement, and the Uniform Commercial Code. . . .  It has been consistently applied in this state to commercial leases. . . .  The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another.  Such power must be exercised in good faith.

-39-

1   2 Cal. 4th at 372 (internal citations and quotations omitted).  Thus, TMC's Recapture Right

2   was subject to the implied covenant of good faith and fair dealing.

3          11.     The California Supreme Court in *Carma Developers (California), Inc. v.*

4   *Marathon Development California, Inc.*, also explained the policy behind and the function

5   of a lessor's recapture right:

6          It is not difficult to understand why parties might agree to such an
           arrangement.  In a rising market, a potential lessee might wish to
7          secure a long-term lease and avoid higher rent over the coming
           years.  By contrast, because of escalating costs, a lessor may be
8          unwilling to make a long-term commitment.  To induce the lessor,
           the lessee may have to offer rent in excess of current market rates.
9          Instead, the lessor may be willing to forego all or part of such
           increased rent in exchange for a termination and recapture clause
10         similar to that at issue here.  Such clause holds out the possibility
           that the premises can be reclaimed before expiration of the lease
11         term.  At the same time, the power to trigger this discretionary right
           remains exclusively with the lessee.
12         . . .

13         Termination of a lease and refusal to consent to a transfer differ
           both in purpose and effect.  A sublease or assignment leaves the
14         lessee liable as a surety for performance of the original lease while
           the sublessee/assignee takes over primary responsibility.
15         Termination, on the other hand, releases the lessee from all further
           obligations and permits the lessor to pursue a completely new
16         lease.

17  2 Cal. 4th at 364.

18         12.     Debtor has argued that TMC requested certain additional documents not

19  expressly required by Section 13 of the Lease and, by virtue of these requests, such

20  documents became incorporated into Section 13 through its catchall subsection (g), which

21  references "such other information and materials as TMC may in good faith request."

22  *See, e.g.,* Debtor's Opposition to TMC's Proposed Findings of Fact and Conclusions of

23  Law , ECF115 at 7.

24         13.     As set forth above, the court finds that TMC received all the documents and

25  information required under Section 13.2 of the Lease prior to electing to exercise the

26  Recapture Provision.  *See* Findings of Fact, ¶¶ 59-60, *supra*.  To the extent that TMC did

27  not timely receive a de minimis number of requested documents, those documents were

28

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

1  not material, and TMC received the equivalent information through other requests or its

2  own due diligence.

3      14.    The court also finds that TMC acted in good faith when it exercised its

4  Recapture Right under the Lease.  The purpose of the required information set forth in

5  Section 13.2 of the Lease was to allow TMC to make a well-reasoned decision whether to

6  consent to a proposed assignment or sublease or to exercise its Recapture Right.  The

7  Recapture Provision allowed TMC to determine that it wanted to capture the future value

8  of the Lease before its natural termination date, and the power to trigger the Recapture

9  Right rested solely with Debtor by submitting a Transfer Notice, which it did.  *See Carma*

10  *Developers (California), Inc. v. Marathon Development California, Inc.*, 2 Cal. 4th at 364.

11  Moreover, TMC had multiple bases on which to decide to exercise its Recapture Right

12  and terminate the Lease, including that (i) the Proposed Assignee required material

13  modifications to the Lease, including that TMC would forfeit the Transfer Profits it was

14  entitled to under the Lease, (ii) the Proposed Assignee's financial backer, Mr. Buttgenbach

15  failed to follow through with numerous attempts by TMC to speak with him, (iii) the

16  Proposed Assignee was a shell entity, without assets, a balance sheet, financial

17  statements, employees, or a bank account, (iv) Mr. Buttgenbach had no prior experience

18  in the restaurant business, and (v) TMC believed that the Proposed Assignee was unlikely

19  to succeed as the majority of the changes to the business plan that the Proposed

20  Assignee suggested had already been tried unsuccessfully by the Tenant.

21      15.    Because TMC properly exercised its Recapture Right when its counsel gave

22  notice to Debtor of such termination in the Recapture Letter dated April 18, 2018, *see*

23  TMC's Exhibit AA; Debtor's Exhibit 66, the Lease was terminated as of May 1, 2018.[3]

24    **ii.    The Debtor is Not Entitled to Relief From Forfeiture.**

25      16.    The Lease did not terminate as a result of Debtor's default or its breach of a

26  covenant or condition under the Lease; rather, the Lease terminated after Landlord TMC's

27  _____

28  [3] Although TMC later purported to accelerate the termination date in its Second Recapture Letter to Debtor dated April 25, 2018, *see* TMC's Exhibit WWWW; Debtor's Exhibit 70, TMC has not demonstrated the basis under which it is entitled to accelerate the date from May 1, 2018.

-41-

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

exercise of a unilateral right to terminate the Lease for a specific nondefault situation, that is, upon Debtor's request to assign the Lease.

17.    Even though a lease may have terminated before the filing of a bankruptcy petition, a debtor in possession may be entitled to be relieved from forfeiture of the lease under California law, in which case assumption of the lease would be proper.  *In re Windmill Farms, Inc.*, 841 F.2d at 1471-1472 (citing *In re Waterkist Corp.*, 775 F.2d at 1091).

18.    In California, "[t]here are three separate statutes that may create an avenue of equitable relief to a tenant who has defaulted under the terms of the lease."  10 Miller and Starr, California Real Estate § 34:224 (Relief from forfeiture) (4th ed. 2018) (citing California Code of Civil Procedure §§ 1174, 1179; California Civil Code § 3275).

19.    None of these statutes apply to a situation where a landlord is exercising its contractual right to terminate a lease and the tenant has not defaulted or breached the lease.  *See* 12 Witkin, Summary of California Law, Real Property § 697, Relief from Forfeiture (11th ed. 2018) ("The general statutory declaration of the right to relief from forfeiture ([Civil Code §] 3275) is supplemented by [Code of Civil Procedure §] 1179, establishing a special proceeding **for the relief of a defaulting tenant**.) (emphasis added).

20.    California Code of Civil Procedure § 1179 ("Section 1179") provides that a court may relieve a tenant against a forfeiture of a lease or rental agreement in case of hardship "as provided in [Code of Civil Procedure] Section 1174."  Code of Civil Procedure § 1174 ("Section 1174"), subsection (a), in turn, provides that the court shall declare forfeiture of a lease if a proceeding be for unlawful detainer "after neglect, or failure to perform the conditions or covenants of the lease . . . or after default in the payment of rent."  Section 1174, subsection (c), in turn, provides that when an unlawful detainer proceeding is filed after a default in the payment of rent, and the Notice to Quit provided to the tenant has not stated the election of the landlord to declare the forfeiture of the lease, a court may stay execution of the judgment for five days, during which time the tenant or

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

1  other party in interest may pay into court the back rent, along with interest, damages, and

2  costs.  If the court so orders and such amounts are paid within the five days, the tenant

3  will be restored to its estate.

4        21.     Section 1179 states in pertinent part as follows:

> The court may relieve a tenant against a forfeiture of a lease or
> rental agreement, whether written or oral, and whether or not the
> tenancy has terminated, and restore him or her to his or her former
> estate or tenancy, in case of hardship, as provided in Section 1174.
> The court has the discretion to relieve any person against forfeiture
> on its own motion.  An application for relief against forfeiture may
> be made at any time prior to restoration of the premises to the
> landlord.

10  California Code of Civil Procedure § 1179.

11        22.     "Section 1179 is a specific statutory procedure that vests a trial court with

12  the authority to affect a judgment after its entry.  The provision applies solely in unlawful

13  detainer actions."  *Gill Petroleum, Inc. v. Hayer*, 137 Cal.App.4th 826, 832-833 (2006); *see*

14  *Pehau v. Stewart*, 112 Cal.App.2d 90, 99 (1952).  It vests the court with discretion to

15  relieve a tenant from forfeiture and restore him or her to his or her former estate or

16  tenancy.  Section 1179 "provides the court with broad equitable discretion to determine

17  the conditions upon which relief will be granted to the end that exact justice may be done."

18  *Gill Petroleum, Inc. v. Hayer*, 137 Cal.App.4th at 828; *see Olympic Auditorium, Inc. v.*

19  *Superior Court*, 81 Cal.App. 283, 287 (1927).  "The proposition that Section 1179, Cal.

20  C.C.P., is applicable in and by the Bankruptcy Courts is so plain, that the point need not

21  be further labored." *In re Burke*, 76 F. Supp. 5, 8 (S.D. Cal. 1948).

22        23.     Sections 1179 and 1174 of the California Code of Civil Procedure have no

23  applicability here for a number of reasons.  Section 1174 by its terms applies in the case

24  of an unlawful detainer proceeding for neglect, failure to perform the conditions or

25  covenants of a lease, or failure to pay rent.  The termination of the Lease in this case was

26  unrelated to any failure by the Debtor to pay rent or any other breach of the Lease by the

27  Debtor.  Rather, the termination was the result of TMC's exercise of an expressly

28  bargained-for right granted to it under the Lease, which right accrued to TMC regardless

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

of whether or not the Debtor was in breach of the Lease.  The evident purpose of Sections 1179 and 1174 is to afford the tenant an opportunity to pay the defaulted rent or otherwise cure any breach under the lease.  Here, there is no breach for the Debtor to cure, so those statutes do not apply.  Indeed, Debtor's principal Mr. Nathan testified that he believed Debtor was not in default of the Lease as of the trial date.  *See* Nathan Declaration, ¶¶ 102-104.

24.    Moreover, the explicit language of Section 1179 of California Code of Civil Procedure makes clear that it does not apply unless there has been some failure by the tenant to perform a condition or covenant under the lease:

> **In no case** shall the application or motion be granted except on condition that full payment of rent due, or full performance of conditions or covenants stipulated, so far as the same is practicable, be made.

California Code of Civil Procedure § 1179 (emphasis added).  In other words, the court may not grant Debtor relief from forfeiture under Section 1179 unless it conditions such relief on Debtor curing whatever breach or default led to the forfeiture.  Here, because the termination was the result of TMC's proper exercise of its Recapture Right, there is nothing that Debtor could cure that could unwind the termination on May 1, 2018.

25.    The application of California Code of Civil Procedure §§ 1179 and 1174, would, under the guise of avoiding hardship, effectively rewrite the Lease to delete the Recapture Provision, which provision was the agreed-to result of extensive negotiations by two sophisticated parties and is perfectly enforceable.

26.    Debtor is also not entitled to any relief from forfeiture under California Civil Code § 3275.  That statute is conditioned upon a forfeiture arising as a result of a contractual party's breach:

> Whenever, by the terms of an obligation, a party thereto incurs a forfeiture, or a loss in the nature of a forfeiture, **by reason of his failure to comply with its provisions**, he may be relieved therefrom, upon making full compensation to the other party, except in case of a grossly negligent, willful, or fraudulent breach of duty.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

California Civil Code § 3275 (emphasis added.); *see Hayward Lumber and Investment Co. v. Construction Products Corp.*, 117 Cal.App.2d 221, 228 (1953) (relief from forfeiture under Section 3275 only available if "the party seeking relief is in default.").

27.    Nor would Section 365 of the Bankruptcy Code, 11 U.S.C., provide such relief.  Even assuming *arguendo* that the Debtor could assume the Lease notwithstanding its prior termination (which is prohibited by 11 U.S.C. § 365(c)(3)), a debtor must assume a lease or executory contract *cum onere*.  Debtor may not delete provisions in a lease that it deems undesirable as part of the assumption process but must accept the lease as is. *In re SCCC Associates II*, 158 B.R. 1004, 1015 (Bankr. N.D. Cal. 1993) (citations omitted). 3 Levin and Sommer, Collier on Bankruptcy ¶ 365.03[3] at 365-29 (16th ed. 2018)(relating to executory contracts in general, but includes leases), *citing inter alia, In re Abitibibowater Inc.,* 418 B.R. 815, 822-823 (Bankr. D. Del. 2009).

28.    Moreover, parties have the freedom of contract, and a party may even waive its right to seek the remedy of relief from forfeiture.  *In re Art & Architecture Books of the 21st Century*, 518 B.R. 43, 49 (Bankr. C.D. Cal. 2014).  Freedom of contract in commercial real property leases is well established in California law.  *Id.*  The California legislature enacted Civil Code § 1995.270(a)(1) to declare it the public policy of the State of California to "enable and facilitate freedom of contract by the parties to commercial real property leases."  California Civil Code § 1995.270(a)(1); *see also 250 L.L.C. v. Photopoint Corp. (USA)*, 131 Cal.App.4th 703, 718 (2005) (quoting California Civil Code § 1995.270(a)(1).  Consistent with this public policy, California courts have generally held that commercial tenants may waive their rights under the California Civil Code.  *250 L.L.C. v. Photopoint Corp. (USA),* 131 Cal.App.4th at 718 (citing *Lee v. Placer Title Co.,* 28 Cal.App.4th 503, 512-513 (1994) (right to quiet enjoyment) and *Folberg v. Clara G.R. Kinney Co.,* 104 Cal.App.3d 136, 140 (1980) (right to notice of rent default)).

29.    The public policy that equity abhors forfeiture is also well represented in California law.  *In re Art & Architecture Books of the 21st Century*, 518 B.R. at 50 (citing California Civil Code § 1442; *Petersen v. Hartell,* 40 Cal.3d 102, 112 (1985); *Reed v.*

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

1  *South Shore Foods, Inc.,* 229 Cal.App.2d 705 (1964); *Deutsch v. Phillips Petroleum Co.,*

2  56 Cal.App.3d 586 (1976)).  California Civil Code § 1442 specifically provides: "A

3  condition involving a forfeiture must be strictly interpreted against the party for whose

4  benefit it is created."  The policy of abhorring forfeitures has been followed in the caselaw

5  wherein courts have strictly construed the language of contracts to avoid forfeiture.  *See,*

6  *e.g., Randol v. Scott,* 110 Cal. 590, 595-596 (1895) (strictly construing language of a

7  contract calling for forfeiture of a lease upon the assignment by the co-lessees not to be

8  triggered upon an assignment by operation of law by the bankruptcy of one co-lessee;

9  opinion stating that forfeiture clauses are to be "restrain[ed] ... to the most technical limits

10  of the terms and conditions upon which the right is to be exercised").

11       30.  However, courts have also held that California Civil Code § 1442 does not

12  warrant a strained or overly technical construction or artificial distinction where forfeiture is

13  plainly required by the express language of a written instrument:

14

15      The rule that a forfeiture clause is to be strictly construed means
    simply that no wider scope is to be given to the language employed

16      than is plainly required. It does not require the court to put a
    strained or overtechnical construction upon the language

17      employed, ignoring the essence of the condition imposed upon the
    legacy and refusing to give effect to the lawful intention of the
    testatrix, to enable a legatee to affirm a will so far as it is to her own

18      profit and at the same time repudiate the validity of its provisions
    which are for the benefit of others. No artificial distinctions are to be

19      taken advantage of or quibbling indulged in to the end that a person
    plainly and palpably coming with the scope of the forfeiture clause

20      may by "some hook or crook" escape the penalty of forfeiture.

21  In *In re Kitchen,* 192 Cal. 384, 389-390 (1923); *see also Urban Properties Corp. v.*

22  *Benson, Inc.,* 116 F.2d 321, 323 (9th Cir.1940) (quoting, at length, *In re Kitchen,* 192 Cal.

23  at 389).

24       31.  This case is a situation where the landlord is not terminating the lease due to

25  a default by the tenant.  Rather, the landlord is exercising its right under the Recapture

26  Provision in its sole and absolute discretion to terminate the lease upon the tenant's

27  request to assign the lease.  The Recapture Provision is a contractual right bargained for

28

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

1  by the parties to a commercial real estate lease represented by counsel in an arm's length

2  negotiation.

3     32.    Because of the parties' freedom of contract, recapture provisions are valid

4  and enforceable under California law and do not present an unreasonable restraint on

5  alienation.  *Carma Developers (California), Inc. v. Marathon Development California, Inc.*,

6  2 Cal.4th at 353-354.

7     33.    Because the California relief from forfeiture provisions relate to situations

8  where the tenant is in default, such provisions do not apply here.  Allowing equitable relief

9  to grant relief from forfeiture would nullify the express contractual right of the Landlord to

10 terminate the Lease under the recapture provision.  *See In re Kitchen,* 192 Cal. 384, 389-

11 390.  In this case, to allow relief from forfeiture upon the exercise of the landlord's express

12 right to terminate unilaterally would mean that there would be no situation where the

13 landlord could exercise such right, which would render the provision meaningless.

14    34.    An analogous situation involves a tenant's failure to timely exercise its option

15 to renew a commercial lease, in which case the tenant is not entitled to relief from

16 forfeiture because a landlord's "refusal to give effect to an acceptance that is one minute

17 late results in no forfeiture."  *Simons v. Young*, 93 Cal.App.3d 170, 182 (1979) (quoting

18 and adopting *Sheveland v. Reed*, 159 Cal.App.2d 820, 822 (1958)).  In *Simons v. Young*,

19 a tenant sought relief from forfeiture from the termination of a lease by expiration of its

20 term when it sought to exercise an option to purchase after the deadline to exercise due to

21 inadvertent neglect.  Reversing the trial court, the appellate court held that allowing

22 equitable relief in such situation would nullify the express terms of the contract regarding

23 the timely exercise of the option.

24    35.    A commercial lease may give one party the option to terminate the lease by

25 notice upon the happening of a certain event.  *See, e.g., Grand Prospect Partners, L.P. v.*

26 *Ross Dress for Less, Inc.*, 232 Cal.App.4th 1332, 1367 (2015) (tenant's option to

27 terminate if anchor tenant ceased operations); *Lewis v. Agoure*, 8 Cal.App. 146 (1908)

28 (landlord's option to terminate lease in the event of his sale of demised premises).

-47-

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

36.     "The option is valid and enforceable even though it results in a termination of the contract and the rights of the other party."  10 Miller and Starr, California Real Estate § 34:163 (Exercise of an option to terminate) (4th ed. 2018) (citing *Maas v. Standard Oil Co. of California*, 220 Cal.App.2d 913, 915-916 (1963)).

37.     In such a situation, "[t]here is no forfeiture of the tenant's rights under the lease but merely an agreed termination on the happening of a certain contingency not related to any act or default by one of the parties."  *Id.* (citing *C.M. Staub Shoe Co. v. Byrne*, 169 Cal. 122, 129 (1915); *11382 Beach Partnership v. Libaw*, 70 Cal.App.4th 212, 218 (1999) (right to terminate upon destruction of the premises); *Maas v. Standard Oil Co. of California*, 220 Cal.App.2d 913, 916-917 (1963) (option of tenant to terminate service station lease if it became impracticable to operate the station); *Alpern v. Mayfair Markets*, 118 Cal.App.2d 541, 542-547 (1953) (option of tenant to terminate commercial lease if premises destroyed by fire); *Chanan Singh v. Cross*, 60 Cal.App. 309, 315 (1922) (option to terminate by lessee if it became impracticable for the landlord to commence to supply water to the demised land to be planted to rice by a specified date); *Lewis v. Agoure*, 8 Cal.App. 146, 147-148 (1908) (option of landlord to terminate lease in the event of his sale of demised premises)).

38.     In *Grand Prospect Partners v. Ross Dress for Less*, a commercial lease provided the tenant with an ongoing option to terminate the lease upon 30 days' notice if the anchor tenant ceased operations and reduced occupancy was not cured in 12 months. 232 Cal.App.4th at 1367.  The court reviewed the relevant caselaw, held that the termination provision was not an unenforceable forfeiture, and announced the rule "that when a commercial lease contains a clause allowing termination upon the occurrence of contingencies that (1) are agreed upon by sophisticated parties and (2) have no relation to any act or default of the parties, *no forfeiture results from the exercise of the termination clause*."  *Id.* (emphasis added).  Similarly here, the Lease was negotiated by sophisticated commercial parties, represented by counsel, TMC was given the option to terminate the Lease upon the occurrence of an event—namely, upon receipt of a Transfer Notice by

-48-

1    Debtor—not upon default or breach by Debtor.  Accordingly, such a termination was not a

2    "forfeiture" from which Debtor can seek relief.

3          39.      Here again, there is no breach for Debtor to cure in order to avoid forfeiture.

4    Rather, there was simply an exercise by TMC of an enforceable contractual right that it

5    was granted under the Lease.  There was no forfeiture, and thus there is no relief from

6    forfeiture.

7    **C.      All Remaining Issues are Moot.**

8          40.      Because the Lease was terminated before the Petition Date and Debtor is

9    not entitled to relief from forfeiture under California law, the court need not decide whether

10   the Debtor is not the Tenant under the Lease and is thus precluded from assuming the

11   Lease.  Either (i) the Debtor is not the Tenant under the Lease, in which case it could not

12   assume the Lease because the Lease was not a "lease of the debtor," *see* 11 U.S.C.

13   § 365(a), or (ii) the Debtor was the Tenant under the Lease, but it is precluded from

14   assuming the Lease because the Lease is "of nonresidential real property and has been

15   terminated under applicable nonbankruptcy law prior to the order for relief," *see* 11 U.S.C.

16   § 365(c)(3).  As indicated on page 2 above, however, if a determination of this issue was

17   necessary to resolve the Motion, the court would find that Debtor is the Tenant under the

18   Lease.

19         41.      Similarly, the court need not rule on Debtor's ability to (A) cure any default in

20   rent payments; (B) compensate TMC for any actual pecuniary loss resulting from any

21   default; or (C) provide adequate assurance of future performance under the Lease.

22   ///

23

24

25

26

27

28

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

### III.   <u>CONCLUSION</u>

For all the foregoing reasons, the court determines that Debtor cannot assume the Lease because it was terminated before the Petition Date, Debtor cannot get relief from forfeiture under California law, and the court should deny Debtor's motion to assume lease under 11 U.S.C. § 365.  A separate final order on the Motion consistent with the findings of fact and conclusions of law set forth herein is being filed and entered concurrently herewith.

IT IS SO ORDERED.

# # #

Date: January 18, 2019

_____
Robert Kwan
United States Bankruptcy Judge

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**